IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,               )
                                        )
        Plaintiff,                      )
                                        )        09-30007-DRH-DGW
vs.                                     )        East St. Louis, Illinois
                                        )        February 3, 2009
LARRY A. BECHEL,                        )
                                        )
        Defendant.                      )


DETENTION HEARING
BEFORE THE HONORABLE DONALD G. WILKERSON
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:          United States Attorney's Office
                            by MS. ANGELA SCOTT, AUSA
                            Nine Executive Drive
                            Fairview Heights, Illinois  62208


For the Defendant:
                            Stobbs Law Offices
                            by MR. JOHN D. STOBBS, II, ESQ.
                            307 Henry Street
                            Suite 211
                            Alton, Illinois  62002


Court Reporter:             Daveanna Ramsey, CSR
                            U.S. District Court
                            750 Missouri Avenue
                            East St. Louis, Illinois  62201
                            (618) 482-9124


        Proceedings recorded by mechanical stenography; transcript
produced by computer.

INDEX OF WITNESS EXAMINATION

|                | DX | CX | RDX | RCX |
|----------------|----|----|----|----|
| Aaron Chapman  | 3  | 28 | 36 |    |


INDEX OF EXHIBITS

| EXHBT     | DESCRIPTION                         | Id'D | Admt'd |
|-----------|-------------------------------------|------|--------|
| Gvt's 1   | (7/26/06 incident report)           | 4    | 5      |
| Gvt's 2   | (12/21/06 DCFS document)            | 15   | 15     |
| Gvt's 3   | (WRPD incident report)              | 17   | 27     |
| Gvt's 4   | (WRPD incident report)              | 26   | 27     |
| Gvt's 5   | (8/20/98 WRPD incident report)      | 20   | 27     |
| Gvt's 6   | (Larry Bechel statement)            | 23   | 27     |
| Gvt's 7   | (Misdemeanor criminal complaint)    | 24   | 27     |


M I S C E L L A N E O U S

Page

Argument by Ms. Scott.......................................39

Argument by Mr. Stobbs......................................43


ADJOURNMENT.................................................50

i.

1          COURTROOM DEPUTY:  The United States of America versus

2     Larry A. Bechel, Case Number 09-30007, is called for a

3     Detention Hearing.  Will the parties please identify themselves

4     for the record.

5          MS. SCOTT:  Good afternoon, Your Honor.  The

6     Government is ready, represented by Assistant U.S. Attorney

7     Angela Scott.

8          THE COURT:  Good afternoon, Ms. Scott.

9          MR. STOBBS:  Good afternoon, Judge.  John Stobbs

10    present with Mr. Bechel.  Ready to proceed.

11         THE COURT:  Good afternoon, Mr. Stobbs.

12         Ms. Scott, how does the Government wish to proceed

13    today?

14         MS. SCOTT:  Your Honor, we're going to present

15    evidence in the form of testimony from the Case Agent.

16         THE COURT:  Okay.  Would you call your witness

17    forward, please.

18         MS. SCOTT:  Yes.  Government calls Special Agent Aaron

19    Chapman.

20         THE COURT:  Agent Chapman, if you would come forward

21    and be sworn.

22              AARON CHAPMAN, GOVERNMENT WITNESS, SWORN

23         THE COURT:  Before we start, Ms. Scott and Mr. Stobbs,

24    have you both received a copy of the pretrial services report?

25         MS. SCOTT:  I have, Your Honor.

1        *THE COURT:*  Mr. Stobbs?

2        *MR. STOBBS:*  And I have gone over with my client and

3   there's no corrections.

4        *THE COURT:*  Okay, no corrections.  I'm not asking you

5   about the recommendations, but the factual portion, no

6   corrections, right?

7        *MR. STOBBS:*  That's right, Judge.

8        *THE COURT:*  Anything on behalf of the Government?

9        *MS. SCOTT:*  No, Your Honor.

10       *THE COURT:*  The Court will take judicial notice of the

11  pretrial services report:  The introduction, the Defendant's

12  history, residence, family ties, employment history, financial

13  resources, health, and the section entitled prior record.  It

14  will not take judicial notice of the assessment of

15  nonappearance and danger or the recommendation portion.

16       You may proceed, Ms. Scott.

17       *MS. SCOTT:*  Thank you, Your Honor.

18                     DIRECT EXAMINATION

19  BY MS. SCOTT:

20  *Q.*  Please state your name for the record, sir.

21  *A.*  Special Agent Aaron Chapman.

22  *Q.*  And where do you work, sir?

23  *A.*  United States Immigration and Customs Enforcement within

24  the Department of Homeland Security.

25  *Q.*  And how long have you worked with ICE?

1    A.   Since November of 2006.

2    Q.   And as part of your duties with ICE, have you assisted the

3    investigation of a Larry Bechel?

4    A.   Yes, ma'am.

5    Q.   Okay.  And do you see Mr. Bechel here in the courtroom

6    today?

7    A.   I do, ma'am.  Seated to your right.

8    Q.   Okay.  And are you familiar, sir, with how the federal

9    investigation began of Mr. Bechel?

10   A.   Yes, ma'am.

11   Q.   And how did that begin?  Can you tell Court briefly.

12   A.   Yes, ma'am.  In 2003, it was July of 2003, the mother of a

13   juvenile child came to the Wood River, Illinois Police

14   Department and indicated that her daughter was being -- had

15   been victim of molestation.

16   Q.   Okay, let me stop you there for just a second.  Are you

17   sure it was 2003 or 2006?

18   A.   I'm sorry, ma'am.  2006.

19   Q.   Okay.  I'm going to show you what's been marked as

20   Government's Exhibit 1, and ask you identify that for the

21   record.

22   A.   Yes, ma'am.  This is actually an incident report from July

23   of -- July 26th of 2006, which details the incident I was just

24   stating.

25             MS. SCOTT:  And Your Honor, I would move for admission

1  for purposes of this hearing only of Government's Exhibit 1.

2        *MR. STOBBS:*  Judge, we've looked at it, I have no

3  objection.  And Ms. Scott has been nice enough to show me all

4  the other exhibits beforehand and we have no objections to any

5  of the exhibits that she wishes to introduce.

6        *THE COURT:*  Exhibit 1 will be received for purposes of

7  this hearing only.

8        *MS. SCOTT:*  And Your Honor, I would note that the

9  victim information has been redacted on these, all these

10  exhibits.

11        *THE COURT:*  Very good.  Identifying information,

12  correct, Ms. Scott?

13        *MS. SCOTT:*  Yes.

14  *Q.  (BY MS. SCOTT)*  And how old does it indicate on this

15  report that the victim was?

16  *A.*  Nine years old, ma'am.

17  *Q.*  And what was her relationship with Mr. Bechel?

18  *A.*  Excuse me for one second.  This was the Defendant's

19  granddaughter.

20  *Q.*  Okay.  I'll direct you to Page 2 of Exhibit 1.

21  *A.*  Yes, ma'am.

22  *Q.*  And the first paragraph.

23  *A.*  Okay.  I'm sorry.  This was the -- this was a different

24  case.  This was the Defendant's niece.

25  *Q.*  Okay.  And in fact you have reviewed several cases

```
1    involving --
2    A.   Related to this Defendant.
3    Q.   -- related to this Defendant?
4    A.   I have.  Including that of his granddaughter.
5    Q.   Now according to the statement by this victim, and I'll
6    refer to her as Wood River victim, did she indicate that
7    Mr. Row -- or I'm sorry -- Mr. Bechel had shown her pictures of
8    what she called nasty girls?
9    A.   Yes, ma'am.
10   Q.   And what did she say these pictures of nasty girls were?
11   A.   She described pictures which depicted a --
12   Q.   Teenagers?
13   A.   Teenagers.
14   Q.   She indicated they looked like teenagers?
15   A.   Yes, ma'am.
16   Q.   And the victim's father, what did he report to the Wood
17   River Police Department as well as DCFS?
18   A.   He indicated that the Defendant had shown him a video of a
19   teenager in Canada and the Defendant having sex with a teenager
20   in Canada.
21   Q.   Okay.  And based on those allegations then was a search
22   warrant executed on Mr. Bechel's home?
23   A.   Yes, ma'am, by the Wood River, Illinois Police Department.
24   Q.   Okay.  And during that search warrant, what was recovered?
25   What was one piece of item that was relevant to the federal
```

1   investigation that was recovered?

2   A.   Included with the items seized was a compact disk.

3   Q.   Okay.   And in that compact disk did it bear a folder titled

4   Vancouver 03 08 04.

5   A.   Yes, ma'am.

6   Q.   Okay.   And did you view --

7            THE COURT:   I'm sorry, zero what now?

8            MS. SCOTT:   03, space, 08, space, 04.

9            THE COURT:   Okay.   I'm sorry.   Thank you.

10  Q.   (BY MS. SCOTT)   Is that right?

11  A.   Yes, ma'am.

12  Q.   And did you view the contents of that folder?

13  A.   I did.

14  Q.   And could you describe for the Court what 22 of those

15  images consisted of?   Just I mean in general terms.

16  A.   Yes, ma'am.   The compact disk as a whole depicted images of

17  the Defendant.   Depicted approximately 44 images of a juvenile

18  female, 22 of those images depicted were of the juvenile female

19  nude and would meet the definition of child pornography.

20  Q.   Okay.   And how did you know that this was a juvenile

21  female?

22  A.   On one of the images depicted it had a Happy Sweet 16th

23  Birthday, Trena, on a birthday cake she was holding, and she

24  was nude.

25  Q.   And some of the pictures that were later that you described

1  that meet the definition of child pornography, did some of

2  those pictures involve that cake, the use of that cake in

3  various ways?

4  *A.*  Yes, ma'am.  Yes, ma'am.

5  *Q.*  And so you knew that this juvenile, this female depicted in

6  the pictures, was 16 at the time the pictures were taken?

7  *A.*  Yes, ma'am.

8  *Q.*  Okay.  And of course 16 is a minor under the federal law;

9  is that right?

10  *A.*  Yes, ma'am.

11  *Q.*  Okay.  Now did the Wood River PD ask at that time for

12  assistance in identifying this female teenager?

13  *A.*  They did.

14  *Q.*  Okay.  And they knew she lived in Canada; is that right?

15  *A.*  Yes, ma'am.

16  *Q.*  And they knew that her nickname was Trena?

17  *A.*  Yes, ma'am.

18  *Q.*  And were they able to identify this individual?

19  *A.*  Yes, ma'am.  Through the assistance of the Royal Canadian

20  Mounted Police they were.

21  *Q.*  And was her name -- her initials S.K.?

22  *A.*  Yes, ma'am.

23  *Q.*  Okay.  And did they interview S.K.?

24  *A.*  They did.

25  *Q.*  Okay.  And did S.K. admit that she had had an on-line

1    relationship with Mr. Bechel?

2    A.   Yes, ma'am.

3    Q.   And did she also admit that Mr. Bechel had traveled to

4    Canada on a couple of occasions to have sex with her?

5    A.   Yes, ma'am.

6    Q.   And did she -- how old did she say she was during these

7    visits to Canada by Mr. Bechel?

8    A.   Fifteen years old, and then she turned 16.

9    Q.   Okay.  And did she indicate that she had broken off with

10   Mr. Bechel after the last visit?

11   A.   Yes, ma'am.

12   Q.   Okay.  Now did you look through Mr. Bechel's travel

13   records?

14   A.   I did.

15   Q.   And did you confirm that he had made two visits, at least

16   two visits --

17          MR. STOBBS:  Judge, I'm going to object, this is all

18   leading.

19          THE COURT:  That's going to be overruled.  I'll allow

20   it in this hearing.  Go ahead, Ms. Scott.

21          THE WITNESS:  Yes, ma'am.  He had visited Canada at

22   least twice.

23   Q.   (BY MS. SCOTT)  Okay.  And can you tell, if you recall, do

24   you -- were the dates in November of '03, December of '03, and

25   February of '04?

1    *A.*   Yes, ma'am.

2    *Q.*   Okay. And do you recall the birth date of the year the

3    victim was born, S.K.?

4    *A.*   I have record of it.

5    *Q.*   Okay. But do you recall --

6    *A.*   It was March 3rd, 19 --

7    *Q.*   Just the year that would have made her 16 in 2004.

8    *A.*   In March of 2004 --

9    *Q.*   1988, does that sound about right?

10   *A.*   Yes, ma'am.

11   *Q.*   Okay. So were you able -- did you also look through

12   Mr. Bechel's credit card records?

13   *A.*   Yes, ma'am.

14   *Q.*   And through looking through his credit card records, were

15   you able to confirm that he had indeed visited Canada on two

16   occasions?

17   *A.*   Yes, ma'am.

18   *Q.*   And were you also able to identify the hospital -- or the

19   hospital -- the hotel that he was in on the second visit to

20   Canada?

21   *A.*   Yes, ma'am.

22   *Q.*   And what hotel was that, sir?

23   *A.*   A Ramada hotel in Vancouver, Canada.

24   *Q.*   And were you able to obtain records from that Ramada Inn in

25   Canada that again corroborated that Mr. Bechel stayed there in

1    February through March of '04?

2    *A.* Yes, ma'am.

3    *Q.* Okay. And was he staying there on March 7th -- let me make

4    sure I have the right date here -- March 3rd of 2004, when the

5    victim S.K. would have turned 16?

6    *A.* Yes, ma'am, he was.

7    *Q.* Okay. Now did you -- after you learned of the name of the

8    hotel and the room that he had stayed in, did you contact an

9    ICE liaison, I guess, to try to get someone to take pictures of

10    that room?

11    *A.* Yes, ma'am. We contacted -- I contacted my ICE attaché

12    officer for Canada, he in turn contacted the Vancouver Police

13    Department; a Detective with Vancouver Police Department did

14    obtain those records for me, which indicated that the Defendant

15    was staying in the room. He additionally photographed the room

16    where the Defendant stayed with the victim.

17    *Q.* Okay. And did you get a copy of those photographs?

18    *A.* I did, ma'am.

19    *Q.* And did you compare those photographs that were taken last

20    month, I guess, to the photographs of the 16-year old victim?

21    *A.* Yes, ma'am.

22    *Q.* And did it -- was it clear to you that this was in fact the

23    same room?

24    *A.* Yes, ma'am.

25    *Q.* Okay. Now did you, yourself, interview Mr. Bechel in

1   December of '08?

2   *A.* I did.

3   *Q.* And can you tell the Court briefly what he said about his

4   relationship with Trena?

5   *A.* He indicated that he met her on the internet and that he

6   traveled to Canada to be intimate with her. That he had gone

7   to Canada, stayed there on at least two occasions, and that he

8   had had sex with her. He stated that he stayed in a Ramada

9   hotel, that he photographed her, that the photographs I had

10  seen were in fact her. He then transported those photographs

11  inside his digital camera back to his home in Illinois.

12  *Q.* Okay. And during that interview did he also mention to you

13  that he knew when he communicated with Trena that she was only

14  15?

15  *A.* Yes, ma'am.

16  *Q.* Okay. And that she had turned 16 when the photographs were

17  taken?

18  *A.* Yes, ma'am.

19  *Q.* Okay. And did he -- what did he tell you that he did with

20  these photographs once he got back to Wood River?

21  *A.* I indicated to him that we had previous police reports that

22  indicated that an individual had been shown photographs and a

23  video of child pornography. He denied showing a video, but

24  admitted that he had shown the photographs of child

25  pornography.

1  *Q.* Okay. So did he admit that he had used the computer in his

2  home to create a CD of these photographs?

3  *A.* Yes, ma'am. I asked him which computer he used and he said

4  it was neither of the computers which were seized by Wood River

5  Police Department, that he had used a separate computer. That

6  he knew child pornography is on that computer so he destroyed

7  that computer by beating it with a hammer.

8  *Q.* Okay. Did Mr. Bechel also indicate that during some of his

9  visits to Vancouver, that he stayed at the home of S.K.?

10 *A.* Yes, ma'am.

11 *Q.* Now turning back to Exhibit 1, this is a report from the

12 Wood River Police Department of a summary of an interview of

13 the Wood River victim; is that correct?

14 *A.* Yes, ma'am.

15 *Q.* And in this summary, what are some of the things that she

16 indicates that Mr. Bechel did to her? And at the time she did

17 this, she was eight; is that correct?

18 *A.* It starts when she was approximately six years old.

19 *Q.* Okay. But when she gave the report she was ten; correct?

20 *A.* Yes, ma'am. Just turned 11. She indicates when she was

21 six years old that Mr. Bechel carried her upstairs and inserted

22 his finger into her vagina. She told him to stop and he yelled

23 you stop. She says on another occasion he came in and began

24 bothering her again. The investigator determined that she

25 referred to the term bothering to him fondling her vagina. She

1  indicated again on a trip to North Carolina that he gave her

2  two pills with Tylenol written on them and they made her very

3  sleepy, and he carried her upstairs, and when she awoke he was

4  bothering her, indicated he was fondling her vagina.

5  Q.  Okay.  And when the search warrant was executed or I

6  believe it was a search of his car, was there in fact a bottle

7  of Tylenol PM found in his possession?

8  A.  Along with other sleep pills.  Yes, ma'am.

9  Q.  Okay.  I'm sorry.  Go ahead, sir.

10  A.  Again, Mr. Bechel, while her -- her at his residence,

11  excuse me, located in Illinois, he showed her nasty girls who

12  appeared to be teenagers on the computer, several pictures on

13  the computer, the pictures were asked [sic] specifically

14  regarding child pornography.  Another occasion at Mr. Bechel's

15  residence, he carried her to his bedroom and touched her vagina

16  with his penis.  He was on top of her.  And said this happened

17  one more time at his house.

18  Q.  Did she also describe him using dildos and vibrators with

19  her?

20  A.  Yes, ma'am.  She goes on and on, he put cream on her

21  vagina, and that she describes different artificial penises or

22  sex toys that he used.

23  Q.  Okay.  And when they did a search of Mr. Bechel's

24  residence, did they in fact find vibrators in his residence?

25  A.  Yes, ma'am.  She was very specific in her description of

some of them and items very consistent with that description
were recovered.

Q.  Okay.  Now during your investigation of Mr. Bechel, did you
have a discussion with the Wood River Police Department Deputy
Chief Otis Steward?

A.  I did.

Q.  And did he indicate to you that this was not the first
instance of sexual -- of complaint of sexual abuse against
Bechel?

A.  Yes, ma'am.  He indicated that Mr. Bechel had been the
suspect of at least five previous complaints involving
children.

Q.  Okay.  And I'm going to show you what's been marked as
Government's Exhibit 2.

        MS. SCOTT:  And I'll move for admission.  I believe
there's no objection.

        THE COURT:  Government's 2 will be received for the
limited purposes of this hearing only.

Q.  (BY MS. SCOTT)  Now according to this document, this is a
document by the Illinois Department of Children and Family
Services; is that correct?

A.  Yes, ma'am, that is.

Q.  And was this document completed during the investigation
related to the Wood River victim?

A.  Yes, ma'am.  Dated 12-21-2006.

1  Q.  Okay.  And during this -- and in this report, do they

2  indicate that there was a report of sexual molestation in

3  October of 1989 that was indicated?

4  A.  Or sustained.  Yes, ma'am.  Their report specifically

5  states that when they use indicated, it's synonomous with

6  sustained.  Yes, ma'am.

7  Q.  Okay.  So basically what they're saying is that they found

8  enough evidence to support that allegation?

9  A.  Absolutely.  Yes, ma'am.

10  Q.  And who was that report made by?

11  A.  The reports October of 1989.

12  Q.  It's in the first paragraph.  I mean first sentence.  I'm

13  sorry.

14  A.  Right.  You're asking for the name of the victim?

15  Q.  Right.

16  A.  The victim of the 1989 --

17  Q.  Not her name.

18  A.  She was nine years old.

19  Q.  Okay.  A nine year old granddaughter?

20  A.  Yes, ma'am -- No, ma'am.

21  Q.  Stepdaughter?

22  A.  Stepdaughter.

23  Q.  I'm sorry.  I'm starting to get them confused, I apologize.

24  So October of 1989 report was by his nine year old -- or his,

25  at the time, his nine year old stepdaughter?

```
 1    A.   Yes, ma'am.
 2    Q.   Okay.  And did they also report that there was another
 3    sustained report of sexual exploitation by Mr. Bechel in March
 4    of 2000?
 5    A.   Yes, ma'am.
 6    Q.   And who made that report?
 7    A.   That was his granddaughter.
 8    Q.   Okay.
 9    A.   Who at the time of the incident was seven years old.  Now
10    this report summarizes the two sustained reports, it doesn't
11    mention the numerous other reports where Mr. Bechel was the
12    defendant.
13    Q.   Correct.  And that's what I was going to ask you next.
14    Wood River indicated that there was additional complaints
15    regarding Mr. Bechel and inappropriate behavior with teenage
16    females?
17    A.   Yes, ma'am.
18    Q.   Okay.  Now I'm going to show you what's been marked as
19    Government's Exhibit 3, and ask you to identify that for the
20    record.
21    A.   This is an incident report from Wood River Police
22    Department.
23    Q.   And is this incident report regarding the allegations by
24    his granddaughter at the -- it would have been his
25    granddaughter at the time?
```

*A.*  Yes, ma'am.  Who at the time was 13 years old.  And

indicated incidents of sexual assault since she was eight years

old.

*Q.*  Now did this report indicate that this -- that the

granddaughter, who I'll refer to as B.B., that after the

allegations were made known about the Wood River victim K.R.,

that she just disclosed more information to her mother about

this abuse by Mr. Bechel?

*A.*  Yes, ma'am.

*Q.*  Okay.  And is this report detailing that?

*A.*  Yes, ma'am.

*Q.*  And can you just briefly summarize, briefly summarize, for

the Court what this report indicates that the abuse she

indicated Mr. Bechel perpetrated on her.

*A.*  Yes, ma'am.  Again DCFS indicated this report was founded

or substantiated.  She indicated that over the past two or

three years he placed his hands down her pants, touching her

vagina.  She believes more happened but she couldn't remember a

lot of specifics.  She remembers that he showed her a purple

vibrator and the Defendant asked her to play with it.  He said

when she questioned another juvenile victim about this, that

juvenile victim became upset and said that he can't talk about

it.  She said that --

*Q.*  When you say play with it, you're talking about the

vibrator, right?

1    A.   Yes, ma'am.

2    Q.   That the K.R. told the mother of B.B. that her and Larry

3    played with this or -- I'm sorry, not B.B -- that she told

4    her -- the brother of B.B.?

5    A.   Who is also a juvenile.

6    Q.   Who is also a juvenile.   That her and Mr. Bechel played

7    with this vibrator?

8    A.   Yes, ma'am.   The same vibrator which was consistent with

9    the vibrator which was recovered during the execution of the

10   search warrant.

11   Q.   Okay.   And did B.B. tell -- or not B.B -- B.B.'s mom, did

12   B.B.'s mom report to the Wood River Police Department that the

13   brother of K.R. had told her that Mr. Bechel had given him and

14   K.R. a blue pill that night?

15   A.   Yes, ma'am.

16   Q.   Okay.   And did she indicated that she confronted Mr. Bechel

17   about the blue pill?

18   A.   She did.   Yes, ma'am.

19   Q.   And what was Mr. Bechel's response?

20   A.   He said that he only gave him Motrin.   And that she said

21   she then re-questioned the children, neither child said they

22   were sick or needed Motrin.

23   Q.   Okay.   And did she say at that time that she prevented her

24   children from visiting Mr. Bechel any further?

25   A.   Right.   Since the incident neither child has been allowed

1    to stay with the Defendant.

2    Q.   Okay.   Now was there also in 1998 -- I'm going to show you

3    what's been marked as Government's Exhibit 5, and ask you if

4    you can identify that for the record.

5    A.   Yes, ma'am.   Government Exhibit 5 is a Wood River Police

6    Department incident report by then Officer Steward dated

7    8-20-1998.

8    Q.   Okay.   And in this report does it contain allegations by

9    what would have been Mr. Bechel's stepdaughter at the time that

10   she alleged the abuse occurred?

11   A.   Yes, ma'am.

12   Q.   Okay.   And she -- at this -- when she gave this report in

13   '98, she was an adult; is that correct?

14   A.   I believe she was 17 or 18.   One second.   Yes, ma'am.   She

15   was an adult.   She was 18.

16   Q.   Okay.   And then did she indicate that she had started

17   having nightmares and flashbacks of what had occurred with

18   Mr. Bechel?

19   A.   Yes, ma'am.

20   Q.   And that's why they were coming forward?

21   A.   Yes, ma'am.

22   Q.   And so did she also tell the police that Mr. Bechel had

23   started molesting her at the age of seven?

24   A.   Yes.

25   Q.   And how long did she say the molestation had taken place?

1  A.  Three or four years.

2  Q.  And did she also indicate that in addition to having the

3  flashbacks, that she had made several suicide attempts, and

4  that she had been to several agencies for counseling?

5  A.  At least six suicide attempts, and several agencies for

6  counseling, and several psychiatric hospitals.

7  Q.  And did her and her mom verify that the two reports

8  regarding abuse to her in particular were made to DCFS?

9  A.  Prior to this?

10  Q.  Prior to this, right.

11  A.  Yes, ma'am.  This is the third.

12  Q.  This was the third?

13  A.  Yes, ma'am.

14  Q.  Okay.  Now --

15  A.  In 1988 and 1998, there were both reports, and they were

16  both investigations by the Wood River Police Department

17  regarding this particular victim.

18  Q.  Okay.  And so the reports were '88, '89, and '90?

19  A.  Eight.

20  Q.  '88, '89, and '98?

21  A.  Yes, ma'am.

22  Q.  Okay.  Did the mother of the victim indicate that she had

23  seen anything unusual in Mr. Bechel's possessions?

24  A.  Yes, ma'am.  She indicated -- she gave long statements.

25  One of the particular items of interest was a photograph of

1    Mr. Bechel's granddaughter, nude, sitting on the chair with her

2    legs spread.

3    Q.   Okay.  Well did the --

4    A.   I'm sorry.  The Defendant's -- one of the Defendant's

5    daughters.

6    Q.   Daughters, okay.

7    A.   Nude in the chair with her legs spread.

8    Q.   And did she indicate that after she saw this picture of the

9    Defendant's daughter nude with her legs spread, she took her

10   kids and run?

11   A.   Yes, ma'am.

12   Q.   And does this report also contain a handwritten statement

13   from the victim L.D.?

14   A.   Yes, ma'am.

15   Q.   And in this statement does she indicate that the Defendant

16   used to touch her vagina?

17   A.   Yes, ma'am.

18   Q.   And that when they were on car rides, he would sit her on

19   his lap and masturbate?

20   A.   Yes, ma'am.  He would make her rub lotion on his penis

21   while he masturbated and stick his hands down her pants.

22   Q.   Okay.  And did she say that he would wear odd things?

23   A.   Yes, ma'am.  She remembers playing with other children, he

24   would come by with short shorts and no underwear on so that his

25   genitalia were exposed, and they would say something to him and

1   he would deny it.

2   *Q.* Okay. And would she -- what did she say about bath time?

3   *A.* In one instance she says at bath time he would rub her

4   genitals very hard. Like I said, it's a lengthy statement.

5   There's numerous --

6   *Q.* But she said he rubbed her privates hard; is that right?

7   *A.* Yes, ma'am.

8   *Q.* Okay. Now was Mr. Bechel confronted about this allegation

9   from L.D.?

10  *A.* In 1998?

11  *Q.* No, during the '89 investigation. I apologize.

12  *A.* Yes, ma'am.

13  *Q.* I should have identified the year.

14  *A.* Yes, ma'am.

15  *Q.* In 1989 -- I'm showing you what's been marked as

16  Government's Exhibit 6. In 1989, he was confronted about

17  molesting his stepdaughter L.D.?

18  *A.* He was.

19  *Q.* Is that correct?

20  *A.* By both DCFS and by Wood River Police Department.

21  *Q.* Okay. And Government's Exhibit 6, is this a report of an

22  interview or a statement made by Mr. Bechel in which he admits

23  touching L.D.'s vagina but says -- or putting her hand on his

24  penis but saying he only did it one time?

25  *A.* Yes, ma'am. This is a report -- this is a handwritten

1   report signed by the caseworker in which Mr. Bechel admitted to

2   the caseworker from DCFS that when the Defendant -- I'm

3   sorry -- when the victim was seated on his lap, he took her

4   hand and put it on his penis.

5   *Q.*   And this victim was his stepdaughter?

6   *A.*   Yes, ma'am.

7   *Q.*   And I want to show you what's been marked as Government's

8   Exhibit 7.   Is this another incident that you learned of from

9   the Wood River Police Department regarding inappropriate

10  behavior by Mr. Bechel with a female teenager?

11  *A.*   Yes, ma'am.

12  *Q.*   And can you tell the Court briefly what this report

13  details.

14  *A.*   This is a misdemeanor criminal complaint against the

15  Defendant indicating that on or about August 30th of 1996, he

16  purchased alcohol for a juvenile minor under the age of 17

17  years old.

18  *Q.*   And after he purchased the alcohol what did the two do?

19  *A.*   He drove the juvenile minor underneath -- across state

20  lines to Missouri where he parked under a bridge and the two

21  consumed the alcoholic beverages until a police officer

22  arrived.

23  *Q.*   Okay.   And did the juvenile female indicate that nothing

24  sexual had happened towards -- between her and Mr. Bechel?

25  *A.*   Yes, ma'am, she did.

1  *Q.* Okay. But did H.B., I believe, indicate that she thought

2  otherwise?

3  *A.* It was K -- the juvenile -- oh, I'm sorry -- yes, ma'am.

4  H.B. indicated that she thought otherwise in this case with the

5  juvenile victim.

6  *Q.* Okay. So she believed what? What did she tell you -- or

7  what did she report she believed was really going on between

8  Mr. Bechel and this teenager he had bought this --

9  *A.* That the two were having sex.

10 *Q.* And in '96 -- okay, that's the -- now with respect to B.B.,

11 did she initially report a single incident of abuse in 2000,

12 but then later in 2006, after this came -- the allegations

13 against K.R. came out, is that when she then came out and said,

14 look, more happened than this one incident?

15 *A.* Yes, ma'am.

16 *Q.* Okay. So we have, if I could summarize, we have

17 allegations from '88, '89, '96, 2000, and two allegations in

18 2006?

19 *A.* And one from '98.

20 *Q.* And one from '98. I'm sorry. Which is L.D.

21 *A.* And two allegations in 2006. Yes, ma'am.

22 *Q.* Okay. And then we have the 2003 and 2004 trips to

23 Canada --

24 *A.* Yes, ma'am.

25 *Q.* -- is that correct? Okay. Now have you been in contact

1   with the Wood River Police Department regarding Mr. Bechel

2   since he's been indicted federally or even --

3   A.   It was actually prior to -- we were originally, as you

4   know, set to indict at one date and it got moved back due to

5   scheduling conflicts.

6   Q.   Okay.

7   A.   So I did speak to the Detective Deputy Chief Steward with

8   Wood River Police.

9   Q.   And what did Deputy Chief Steward note to you about

10  Mr. Bechel and his possessions?

11  A.   I told Deputy Chief Steward that -- I initially told him

12  that it had been -- the Indictment had been postponed.  When I

13  told him the Indictment had been re-set, he said good because I

14  know he is selling off some of his things.

15  Q.   And this was from Deputy Chief Otis Steward?

16  A.   Steward.  Yes, ma'am.

17  Q.   Of Wood River Police Department?

18  A.   Yes, ma'am.

19  Q.   Now did Mr -- Deputy Steward tell you about another

20  incident involving Mr. Bechel's mother?

21  A.   Yes, ma'am.

22  Q.   Okay.  And I'm going to show you what's been marked as

23  Government's Exhibit 4.  And I'm going to ask you to tell the

24  Court what that is briefly.

25  A.   Again, this is an incident report from Wood River Police

Department, this one is regarding an incident that took place

on Tuesday, October 31st of 2006.

Q.  Okay.  And what happened on that date?

A.  On that date, Mr -- Detective Chief Steward was contacted

by the parent of one of the victims.

Q.  K.R.?

A.  K.R., whom the Defendant had allegedly abused.  That parent

of K.R. indicated to Detective Chief Steward that he had been

approached by the Defendant's mother and offered a bribe to get

the Defendant -- to get the victim to drop her testimony

against the Defendant.

Q.  Okay.  And was the -- and the Defendant's mother's name is

Ida Helmcamp?

A.  Yes, ma'am.  Ida Helmcamp offered the victim's father --

Q.  Mr. R.?

A.  -- Mr. R. $50,000, indicating that she'd give him $25,000

down and $25,000 once the case was dropped, because she

indicated Larry's going to prison for a long time if this goes

through.

Q.  Okay.

        MS. SCOTT:  Nothing further, Your Honor.

        THE COURT:  Thank you.  What about your exhibits?  I

recall only 1 and 2 admitted.

        MS. SCOTT:  Okay.  I would move for admission of 1-7.

        THE COURT:  Government's 1-7 will be admitted for

1    limited purpose of this hearing only.

2            *MS. SCOTT:*  This hearing only.

3            *THE COURT:*  Mr. Stobbs, you may inquire, sir.

4                        CROSS EXAMINATION

5    BY MR. STOBBS:.

6    *Q.*  Agent Chapman, you began investigating the case last year;

7    is that right?

8    *A.*  Yes, sir.

9    *Q.*  And you testified before the Grand Jury about most of what

10   you testified to here today?  Did you testify to the Grand

11   Jury?

12   *A.*  Yes, sir.

13           *MR. STOBBS:*  Judge, under 26.2(g), I'd like to have a

14   copy of his Grand Jury transcript.

15           *MS. SCOTT:*  Your Honor, I don't have that with me here

16   now.  I can try to get it faxed here within the next -- but I

17   can tell --

18           *MR. STOBBS:*  If we could have a second?

19           *THE COURT:*  Absolutely.  Uh-huh.

20                   *(Discussion held off the record between Ms.*

21                   *Scott and Mr. Stobbs.)*

22           *MR. STOBBS:*  Judge, what I'd like to do is to speed

23   things up.  If Ms. Scott could get me it some time this week,

24   I'd appreciate it, in case I need to file some sort of

25   memorandum after today, as opposed to having to wait for it to

be faxed here and me to see that there is probably nothing
there to ask.

      *THE COURT:* Ms. Scott, is that acceptable?

      *MS. SCOTT:* I'm sorry?

      *THE COURT:* Is that acceptable? He says --

      *MS. SCOTT:* Oh, sure. Sure. Yes. I'm sorry.

      *THE COURT:* That's fine.

      *MR. STOBBS:* Thanks, Judge.

      *THE COURT:* All right.

*Q. (BY MR. STOBBS)* Now there is different -- how long have
you been an ICE Agent?

*A.* Since November of 2006.

*Q.* And where did you work before that?

*A.* I was a Detective Sergeant with the Maryland
Transportation -- a Detective Sergeant with the Maryland
Transportation Authority Police, where I was so employed for
seven years and seven months.

*Q.* And where were you before that?

*A.* In college.

*Q.* Okay.

*A.* In the United States Army and Army Reserve.

*Q.* Okay. And you're familiar then that there is different
levels of discretion in terms of whether or not charges are
instituted, right?

*A.* Between where I was employed before and here?

1   Q.  Well, for example, here you testified for about 35 minutes

2   about all of these things that allegedly happened in 1989,

3   1988, and all that; is that correct?

4   A.  That's correct.

5   Q.  And I didn't hear you, how many -- how many of these cases

6   was Mr. Bechel charged criminally?

7   A.  Two of them so far.

8   Q.  Well, let's -- and that's the 2006 case, right?

9   A.  Correct.

10  Q.  And that's this case, right?

11  A.  Correct.

12  Q.  So all that other stuff, that's just a lot of smoke, right?

13  A.  No, sir.  As I testified earlier, both -- two of those

14  instances were indicated sustained by DCFS employees who were

15  trained to investigate these instances.

16  Q.  Well are you aware that DCFS always comes back founded?

17  A.  Only two of these instances were founded.

18  Q.  How many -- how much dealing have you had with the Illinois

19  Department of Children and Family Services in Madison County,

20  Illinois?

21  A.  Limited.

22  Q.  Limited.  And they come back with a finding but when it's

23  presented to the States Attorney's Office, he's not charged,

24  right?

25  A.  In several of these cases that is the instance, correct.

1  *Q.* Well actually in all these cases but two, right?

2  *A.* Which would be several. Yes, sir.

3  *Q.* So in all these cases but two, yes or no?

4  *A.* He was not charged, yes, as I said earlier.

5  *Q.* Now something caught my attention while you were talking.

6  You prepared a report in this case, right?

7  *A.* I did.

8  *Q.* And when you talked to Mr. Bechel, you said that he had

9  child pornography on a computer that he destroyed?

10 *A.* Yes, sir.

11 *Q.* Is that contained in your report?

12 *A.* Yes, my report indicates that he used a computer to

13 download images of child pornography via the compact disk.

14 *Q.* Now you're talk -- let's talk about this girl up in Canada,

15 first of all. She was 16 at the time, right?

16 *A.* Fifteen and 16.

17 *Q.* Sixteen. You have a picture of the birthday cake that says

18 16, so you assume that she was 16, right?

19 *A.* On that instance; however, both the Defendant and she

20 stated that this was the second time they had gone up there,

21 and they had sex on the first time when she would have been 15.

22 *Q.* If you can just answer my question, that would be just

23 fine.

24     *THE COURT:* Just a minute. Stop right there. I find

25 his response to be in response to your question. Ask better

1  questions.  Go ahead.

2  Q.   *(BY MR. STOBBS)*  The -- you made an assumption, yes or no,

3  that she was 16 at the time because there was a cake?

4  A.   Which indicated Happy 16th birthday, correct.

5  Q.   And had there been a cake that said 18, you would have

6  assumed she was 18?

7  A.   Yes, sir.

8  Q.   That happened about almost five years ago, right?

9  A.   Correct.

10  Q.   So today she would be either be 20 or 21?

11  A.   The instance was in 2003.  Correct, yeah.

12  Q.   I made my objection and lost my place.  I'll just move on.

13  The pictures that -- his two computers were seized by Wood

14  River; is that right?

15  A.   That's correct.

16  Q.   And they were taken to the FBI to do, I guess, lab analysis

17  or whatever the magic word is to see what was on the hard

18  drives, right?

19  A.   A Granite City investigator conducted forensic analysis of

20  one and an ICE investigator conducted analysis on the second.

21  Q.   And nothing came back?

22  A.   Nothing as far as?

23  Q.   There's no child pornography on there?

24  A.   No, I don't believe there was any child pornography.  No,

25  sir.

*Q.* There were 44 images of this young lady in Canada, right?

*A.* Forty-four images. Yes, sir.

*Q.* Okay. And 22 of them were this young lady is naked; right?

*A.* Twenty-two of them were consistent with child pornography. She was naked more than just 22.

*Q.* I'm not arguing the child pornography, I'm just asking there was 22 that you felt were something that could be charged for child pornography?

*A.* Yes, sir.

*Q.* And he's been charged with six of those in Madison County, right?

*A.* Six of those images?

*Q.* Well, yes. He's charged with possession of child pornography in Madison County. It's the same child pornography, that's the same girl in Madison County that's in the federal case, right?

*A.* I'm not sure of that to be honest. I'm sure I have the report if you like me to review it.

*Q.* Well, I'd like you to review it.

*A.* You talking the Wood River, Illinois Police Department, charged by Wood River, Illinois?

*Q.* Wood River doesn't charge, the Madison County State's Attorney.

  *THE COURT:* I'm not understanding. What are you asking him to find, Mr. Stobbs?

1    MR. STOBBS:  Judge, the point I'm making is that the

2  pictures that he's charged with in Madison County are of the

3  same individual as he's charged with here.

4    THE COURT:  I understand that.  But I mean what is it

5  that you're asking him to find?

6    MR. STOBBS:  If you understand it, then I can just

7  move on.  If he doesn't contest that I can move on because I

8  think that's an important point in terms of --

9    THE COURT:  Okay.  I mean I just don't understand what

10  you're asking him to find in his report.

11    MR. STOBBS:  He said he thought it was in his report.

12    THE COURT:  Okay.  All right.

13    THE WITNESS:  No, I said I thought it was in the Wood

14  River Police Department.  They were describing who they were

15  charging.

16    MR. STOBBS:  Okay.

17    THE WITNESS:  And actually I don't have that, but I

18  don't have any reason to contest it.

19  Q.  (BY MR. STOBBS)  That's all I'm asking.  Thanks, Agent.

20  The 2006 -- you're familiar with the fact that Mr. -- well,

21  first of all, let me ask you this.  Mr. Bechel's mother, you

22  say that she apparently made some sort of a bribe offer to one

23  of the witnesses in this case?

24  A.  Allegedly.  Yes, sir.

25  Q.  Has she been charged?

1   *A.* No, sir.

2   *Q.* To your recollection, do you know if Mr. Bechel had

3   anything to do with that?

4   *A.* As with the other previous instances that he wasn't

5   charged, they're all showing pending status, which means the

6   investigation continues.  So I don't have any other

7   information.

8   *Q.* Okay.  Now you're aware that his son died in April of 2006,

9   right?

10   *A.* Yes, sir.

11   *Q.* And you're aware that he inherited $250,000 from his son

12   dying, right?

13   *A.* I just became aware of that.  Yes, sir.

14   *Q.* From a life insurance policy.  You're aware of that now,

15   right?

16   *A.* Yes.

17   *Q.* And are you aware that his nephew requested that Mr. Bechel

18   give him some of that money?

19   *A.* No, I'm not.

20      *MS. SCOTT:*  Your Honor, I would object to the

21   relevance of his nephew asking him for money as to whether or

22   not he should be detained.

23      *THE COURT:*  I'll overrule it at this point.  I'll give

24   Mr. Stobbs a little leeway.  Get it, wrap it up, Mr. Stobbs.

25   *Q.* *(BY MR. STOBBS)*  When in Canada, do you know how they

1  identified this girl up there?  How the Canadian Police

2  identified her?

3  *A.*  Not specifically.  I just know it was the Royal Canadian

4  Mounted Police.

5  *Q.*  Have you spoken to them at all?

6  *A.*  No, sir.  I have not.

7  *Q.*  Has anyone in ICE spoken to the Canadian Mounted Police?

8  *A.*  Yes, sir.

9  *Q.*  And do you have any reports on that other than what you've

10  talked about today?

11  *A.*  No.  No, sir.

12       *MR. STOBBS:*  I don't have any other questions, Judge.

13       *THE COURT:*  Okay.  Thank you, Mr. Stobbs.  Ms. Scott,

14  anything further?

15       *MS. SCOTT:*  Just briefly, Your Honor.

16              REDIRECT EXAMINATION

17  BY MS. SCOTT:

18  *Q.*  I'm showing you the portion of the report that you made

19  regarding your interview with Mr. Bechel.  And in the bottom

20  it's Bates Stamped Number 90; is that correct?

21  *A.*  Yes, ma'am.

22  *Q.*  And doesn't it say in this paragraph that Mr. Bechel

23  admitted that he had destroyed his hard drive on his computer

24  that he used to create the CD with child porn on it after Wood

25  River didn't seize it?

1    *A.*   Yes, ma'am.

2    *Q.*   So that is in your report, isn't it?

3    *A.*   Yes, ma'am.

4    *Q.*   You're not trying to hide anything, are you?

5    *A.*   No, ma'am.

6    *Q.*   Now you were also asked about whether or not the victim was

7    16 or 15.  You know he went up there in '03, right?

8    *A.*   Yes, ma'am.

9    *Q.*   She turned 16 on March 3, '04, how old would she have been

10   when he had sex with her in 2003?

11   *A.*   Fifteen, ma'am.

12   *Q.*   Okay.  He was up there from February 29th to March 2nd of

13   '04, and they had sex then, didn't they?

14   *A.*   Based on both of their --

15   *Q.*   How old would she have been then?

16   *A.*   Fifteen and then 16.

17   *Q.*   Okay.  And then he said in his statement she was 15, didn't

18   he?

19   *A.*   Yes, ma'am.

20   *Q.*   And she said in her statement that she was 15 when they

21   first started having sex, didn't she?

22   *A.*   Yes, ma'am.

23   *Q.*   And does it matter whether or not she was 15 or 16 anyway?

24   *A.*   No, ma'am.

25   *Q.*   She was a minor, wasn't she?

1    A.   Yes, ma'am.

2    Q.   And he took -- he took pictures of her in various poses

3    with this birthday cake, didn't he?

4    A.   Yes, ma'am.

5    Q.   And these poses were her showing her vagina and everything

6    else, wasn't it?

7    A.   Yes, ma'am.

8    Q.   Now you were also asked about these incidents that we went

9    over with B.B. and L.D.  Just because these incidents were not

10   charged by the State's Attorney, does that mean that these

11   incidents did not happen?

12   A.   No, ma'am.

13   Q.   Did these kids have any reason to come in here and lie?

14   A.   No, ma'am.

15           MS. SCOTT:  Nothing further, Your Honor.

16           THE COURT:  Mr. Stobbs?

17           MR. STOBBS:  No, thank you.

18           THE COURT:  All right.  Thank you, Agent.  You're

19   excused.  Ms. Scott, any further evidence?

20           MS. SCOTT:  No evidence.  Only argument.

21           THE COURT:  Mr. Stobbs, any evidence?

22           MR. STOBBS:  No, sir.

23           THE COURT:  Let me see the lawyers just a second up

24   here, please.

25                   (Sidebar discussion held off the record between

1          *Court and counsel.)*

2          THE COURT:  All right, very good.  Ms. Scott, if you'd

3     like to make any arguments, you may at this time.

4          MS. SCOTT:  Thank you, Your Honor.  I'll be brief.  I

5     know we're running a little later than you probably had

6     planned.

7          THE COURT:  That's all right.

8          MS. SCOTT:  I'm just going to go through the elements

9     real quickly here that the Court needs to consider when

10    determining whether or not someone should be detained.

11         THE COURT:  First of all, is this a presumption case?

12         MS. SCOTT:  Yes, it is, because it's a sexual

13    exploitation charge.

14         THE COURT:  Mr. --

15         MR. STOBBS:  I agree with that.

16         THE COURT:  You agree that this is a presumption case?

17         MR. STOBBS:  Yes, I do.  I do.

18         THE COURT:  Okay, very good.

19         MS. SCOTT:  Your Honor, I put the exhibits there for

20    your convenience.

21         THE COURT:  All right.

22         MS. SCOTT:  And I just want to point to a couple of

23    factors.  One, the nature and circumstance of the offense

24    charged.  Your Honor, here we're talking about a man who

25    traveled to Canada twice to have sex with a person that he knew

was 15 years old.  He took nude photos of her when she was 16
with the birthday cake saying Happy 16th birthday, Trena.  And
if you would have seen some of the poses he had her do with
that cake, it's disgusting.  And he also showed these photos
not only to the victims of -- the Wood River victim's father
Mr. R., but also possibly to K.R. herself.  That's how we knew
about the federal offense, Your Honor.

When you look at the weight of the evidence against
the Defendant, we believe that the evidence here is very
strong.  We have the Defendant's own admissions.  He admitted
that he traveled to Canada.  He admitted that he had sex with
her when she was 15.  He admitted taking pictures of her when
she was 16.  That he transported them back to the United
States.  And the victim also was interviewed, she confirmed
that he traveled to Canada to have sex with her, that she was
15 and 16 at the time, and that they did have -- in fact have
sex.  His credit card records, his travel records corroborate
the fact that he traveled to Canada, and motel records
confirmed that the room he was staying in with the victim when
the pictures were taken.

When you consider the history and characteristics of
the Defendant, Your Honor, we have at least six reports of
sexual molestation made by teenage females.  We have '88, a
1989, 2000.  The '88 and '89 were by his then stepdaughter
L.D.; the 2001 was by his granddaughter B.B.; and in '98, L.D.

reported again that she had been molested by her stepfather,
Mr. Bechel, since she had been about seven years old.  That she
had flashbacks, she tried to commit suicide.

And then we know that in '03 and '04 he was traveling to
Canada to have sex with a 15-year old victim.

In July of '06, then we find out that he's been sexually
molesting his niece, including using his finger, rubbing his
penis on her vagina, using vibrators.  A lot of what the victim
reported, a lot of the items -- or the vibrators that she
described him using were found in his house during the search
of the house.

We would also indicate that DCFS found two of the reports
indicated.  And Your Honor, I honestly can't sit here and tell
you why he was not charged with these offenses.  But my
argument would be that the fact that he was not charged with
them doesn't mean that they did not happen.

And then finally, the nature and seriousness, danger to any
person or the community if the Defendant was released.  Your
Honor, this person is a danger to the community.  He's a danger
to young teenage females.  Not only do we have a sexual
molestation of them, we know that he bought liquor for a minor
female in the past.  Although she denied having any sexual
contact with Mr. Bechel, the H.B. indicated that she believed
that he was having a sexual relationship with them [sic].
Mr. Bechel apparently has an infinity for young girls.

They also investigated K.R.'s brother, T.R., and found that he had not been or did not appear to have been sexually molested by Mr. Bechel, although they found that there was a substantial risk of abuse.  When I'm saying they, I'm referring to DCFS.

So we would also argue that he is a flight risk.  He has the resources to flee.  Although he does not have a passport, ICE did take custody of his passport, he has resources to flee. He has a $250,000 settlement that we know about.  And we also know from Chief Steward's statement to ICE Special Agent Chapman that Mr. Bechel has been in fact selling off his possessions.

We have the potential for obstructing justice here.  If we have -- we have a charge, allegation here by Mr. R., that he was approached by the Defendant's mother and offered $50,000 if K.R. would not pursue the charges against Mr. Bechel or otherwise he was going to do a lot of time.

There is also the potential, Your Honor, that S.K. could be contacted.  Although we have been careful to redact all information as to her whereabouts, you know, that does not -- that cannot -- that might not prevent him from contacting her in the future to try to get her to deny the sex, or her age, or anything like that.

So Your Honor, we believe that all of the elements have been met, and that Mr. Bechel should be detained.  And he is a

danger to the community.  He is a danger to any young girls who are near him.  Thank you, Your Honor.

MR. STOBBS:  He presented that same danger in 2004, 2005, 2006, 2007, 2008.  And guess what, Judge?  Nothing.  This is a case that started in 2004.  They arrested him in 2006. And maybe I'm jaded because I'm from Madison and I do a lot of defense work there, but I'm telling you, Madison County, they err on the side of charging someone.  You have an elected official whose a State's Attorney that's not going to let these kind of allegations go by unless there is nothing there.  And to say, well, you know, just because that he didn't get charged, doesn't mean it didn't happen.  He's not been convicted of anything, Judge.  You know, and something that being from Madison County, they charge anything there.  And I almost ask you to take judicial notice of that.  But I mean it's something that -- these crimes are almost five years old.

And I think that, you know, in Canada at the time, and I have the statute I think, that in Canada at the time, in 2004, the age of consent was 14.  And I realize that has nothing do with anything, but it's something that is unique to Canada.  So it's not like he went up to Canada and in the Canadian's eyes having sex with a 16-year old girl is against the law, here it would be, but there it's not.

THE COURT:  Bad luck for him that he took some pictures allegedly and brought them back.

1          MR. STOBBS:  That's right, and brought them back.

2     Brought them back.  That's not just bad luck, that's horrible

3     luck.  And it's even worse luck that he didn't have a birthday

4     cake that said 18 instead of 16.  It's the pictures of the

5     girl, from what I understand is -- when I think of child --

6     you've done a lot more than anyone in this room -- when I think

7     child pornography, I look at it differently than, I guess

8     because I'm jaded or something, but it's not -- it's not of a

9     little girl.  It's of someone developed.  But I understand what

10    you're saying.  The photographs were seized in 2006.  There's

11    six counts in Madison County of the exact same victim.  The

12    exact same victim.

13         And I spoke to Brian Polinsky [phonetic] who is

14    Mr. Bechel's attorney in Madison County, and he indicated that

15    the first count regarding the grandniece, that's something that

16    is defensible and he's willing to go to trial in Madison County

17    on that.  But I don't think he should be presumed guilty of

18    that until he's actually been found guilty of it.

19         And I found a case it's *U.S. v. Kennedy*, and it's

20    Western District of Washington case, and what happened in that

21    case was an individual was charged with a crime that the Adam

22    Walsh Act didn't cover.  And then he was superseded and he was

23    admitted to bond -- and then actually I have a copy of it --

24    and he was actually admitted to bond.  And then he was

25    superseded on something where the Adam Walsh case kicked in and

Magistrate Donahue, he had to grabble with the Adam Walsh Act and the bond conditions, and the Magistrate found that the mandatory conditions of the Adam Walsh Act violated various portions of the constitution.

And I'm not arguing that here. But what I'm saying, Judge, is he's been on bond for two years in Madison County. And the comparison that I would make is like when Judge Donahue was saying, I think he said on Page 5, he says, "There's been no showing the Defendant is any more of a flight risk or threat to the community now then he was at the time of his original appearance bond."

There is absolutely no evidence today, Judge, that Mr. Bechel is any more of a flight risk or a danger to the community than he was in 2006, in July of 2006, and when he appeared over in Madison County. And I just -- I just think that this is the same thing here. You know, that there's just -- there might be a whole lot of smoke, but in terms of bond, you know, you're hopefully going to be able to consider whether or not there is any sort of conditions that you can impose to ensure that Mr. Bechel appears in court, is not a flight risk. And I think that the -- first of all, the Madison County case, one of those charges is a Class X, that carries a sentence of six to 30 years, minimum of six years, maximum of 30 years. So he had a pretty good reason to flee then.

And you know in terms of him selling things off, I

don't know, there's been no evidence other than, you know,
Steward saying that.  But I don't -- maybe he's paying his
attorney's fees.  I don't know.

It's something that here I think that you can pose
some sort of a bond restriction on him, home confinement,
everything that I think that pretrial officer's put into the
report to ensure that he appears in court and is not a flight
risk.  Thank you.

THE COURT:  Thank you.  Ms. Scott, anything?

MS. SCOTT:  Your Honor, again, I cannot speak for why
Madison County did not charge him with all of the offenses.
But I would like to mention one thing here, Your Honor.  These
pictures, I have seen these pictures.  I'm not -- I know
Mr. Stobbs has not seen them yet because we have not been able
to get an appointment together for him to view them, but these
are pictures of a little girl, Your Honor.  And I have a little
eyelets if the Judge wants to see them.  This is obviously a
little girl.

THE COURT:  Okay, I'll take a look at them.

(Sidebar Discussion was held off the record
between Court and counsel.)

MS. SCOTT:  Your Honor, and the fact that it's not as
bad as some of the child porn that I have seen, too, it does
not mean that Mr. Bechel should be released on bond.  This is a
horrible crime he committed.  He is a vicious predator.  And I

1 believe that he needs to be detained, Your Honor.

2      *THE COURT:* Thank you, Ms. Scott. Mr. -- Alrighty.

3 And that's -- okay, very good. I want to make sure that

4 everybody has had an opportunity to be heard.

5      And Mr. Bechel, your attorney has made eloquent

6 arguments, and now it's my turn to tell you what the law is.

7 The law in this case is that this is a case that is covered by

8 what's called a presumption. And it's my duty to enforce that

9 law. Congress has passed that law, and that law says that

10 somebody whose charged with what you're charged with is

11 presumed under the law to be a danger to the community. They

12 have a right to rebut that presumption. So in other words,

13 when we have this hearing, the ball starts in your court on the

14 side of me not granting you a bond. You're presumed to be a

15 danger. You can rebut that by presenting evidence that moves

16 the ball back over on the other side of the court.

17      And I want to just before I make my announcement, my

18 decision, it's a different standard, Mr. Stobbs. I will email

19 Judge Donahue, he's a friend of mine, in a few minutes, and

20 it's in that case, and it was a quick glance, it appeared to be

21 a federal bond and then a federal reindictment.

22      *MR. STOBBS:* I know that.

23      *THE COURT:* In this case we've got a state case where

24 the State of Illinois has a different standard. I don't even

25 know what their standard is for bond. But I know what it is in

1    the federal court, especially on a charge like this.  He's

2    presumed to be a danger.

3         And I'm going to make a determination that I've heard

4    no evidence that rebuts the presumption.  And I'm going to make

5    a finding that there are no conditions or combination of

6    conditions that will reasonably assure the safety of any person

7    or the community, and I'm going to order Mr. Bechel detained

8    until his trial.  That's going to be the ruling of the Court on

9    this matter.  Anything further?

10        *MS. SCOTT:*  Only thing I would ask for, Your Honor, is

11   additional condition that Mr. Bechel -- neither Mr. Bechel nor

12   his mother have any contact with S.K. or attempt to try to make

13   contact with S.K.

14        *THE COURT:*  Well, I mean, I don't know that that's a

15   condition.  He's going to be detained.  I'm sure Mr. Stobbs

16   will inform his client about the possibilities of witness

17   tampering and being involved in obstruction of justice.  But

18   that's Mr. Stobbs' job, not the Court's job, and I'm sure he

19   will tell him that.

20        *MS. SCOTT:*  Thank you, Your Honor.

21        *THE COURT:*  Hopefully the message will get to his

22   mother, you know, that these are not things that are looked

23   upon favorably, and that additional felony criminal charges can

24   come out of such conduct.

25        *MS. SCOTT:*  Thank you, Your Honor.

1         *MR. STOBBS:* If I can bring up two things.

2         *THE COURT:* Yes, sir.

3         *MR. STOBBS:* The first thing, I wasn't trying to

4 mislead you on that.

5         *THE COURT:* No, I understand.

6         *MR. STOBBS:* I knew exactly what it was.

7         *THE COURT:* I understand.

8         *MR. STOBBS:* And second thing, Mr. Bechel has some

9 health issues. His daughter -- or maybe last week, his

10 daughter took his medicine to him, and I think they're real

11 health problems. I think he had a stroke and something placed

12 in his heart, stints in his heart.

13         *THE COURT:* Stint. I saw that, yeah.

14         *MR. STOBBS:* And he's got real medical issues. And

15 she took the medicine to Perry County, and they wouldn't give

16 it to him because he hadn't been seen by a doctor, which I

17 understand. So if there is something that -- I don't want

18 him -- some emergency on us.

19         *THE COURT:* No problem.

20         *MARSHAL SLAZNIK:* Yes, Your Honor. I'll see to it.

21         *THE COURT:* The United States Marshal himself is

22 present in the courtroom and he just told the Court that he

23 will see to it.

24         *MR. STOBBS:* Yes, sir. Thanks, Judge.

25         *THE COURT:* All right. Anything further?

1          MS. SCOTT:  No, Your Honor.

2          MR. STOBBS:  No, sir.

3          THE COURT:  Anything further?  All right.  Mr. Bechel

4    is remanded to the custody of the United States Marshal Service

5    to be held until his trial.  Do we have a trial date on that,

6    Jackie?  May 11th.  To be held until his trial on May 11th.

7    Good luck, Mr. Bechel.

8                    * * * * * * * * * *

9                         -oOo-

10          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
11   Date:  6/16/10          /s/ Daveanna Ramsey
                      Daveanna Ramsey, Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25