1          IN THE DISTRICT OF THE UNITED STATES OF AMERICA
2                FOR THE SOUTHERN DISTRICT OF ILLINOIS

_____ )
3   **UNITED STATES OF AMERICA,**              )
                                              )
4                      Plaintiff(s),          )
                                              )
5        vs.                                  )   Case No. **09-30007-DRH**
                                              )
6   **LARRY A. BECHEL,**                       )
                                              )
7                      Defendant(s).          )
_____ )

8

9

10

11                          **SENTENCING**

12   BE IT REMEMBERED AND CERTIFIED that heretofore on  **08/12/2010,**
     the same being one of the regular judicial days in and for the
13     United States District Court for the Southern District of
     Illinois, **Honorable David R. Herndon,** United States District
14   Judge, presiding, the following proceedings were recorded by
       mechanical stenography; transcript produced by computer.

15

16

17

18                         **APPEARANCES:**

19   *FOR PLAINTIFF:*  **James A. Gomric,** O'Gara, Gomric *et al.,* 6 East
     Washington, Belleville, IL 62220
20
     *FOR DEFENDANT*: **Angela Scott,** Assistant U.S. Attorney - Fairview
21   Heights, 9 Executive Drive, Suite 300, Fairview Heights, IL
     62208
22

23
     *REPORTED BY*:  **Molly N. Clayton, RPR, FCRR,** Official Reporter
24   for United States District Court, SDIL, 750 Missouri Ave., East
     St. Louis, Illinois 62201, (618)482-9226,
25                *molly_clayton@ilsd.uscourts.gov*

1  <u>**INDEX OF WITNESS EXAMINATION**</u>

2                              <u>**DX**</u>       <u>**CX**</u>      <u>**R-DX**</u>     <u>**R-CX**</u>

3  No witness testimony.

4

5

6  <u>**INDEX OF EXHIBITS**</u>

7  <u>**EXHIBIT**</u>            <u>**DESCRIPTION**</u>          <u>**Id'D**</u>        <u>**Rcv'd**</u>

8  No exhibits identified or received.

9

10

11  <u>**MISCELLANEOUS**</u>

12                                              <u>**PAGE**</u>

13  *5K1 argument, government*                    *22*
    *5K1 argument, defense*                       *24*
14  *Recommendation, government*                  *27*
    *Recommendation, defense*                     *32*
15  *Allocution*                                  *44*
    *Rulings by the Court*                        *45*

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Let the record reflect that we're in open

2    court.  We call the matter of *The United States of America*

3    *versus Larry A. Bechel*, 09-30007.  The government is present,

4    represented by assistant United States attorney Angela Scott.

5          Good morning, Mrs. Scott.

6          *MS. SCOTT:*  Good morning, your Honor.

7          *THE COURT:*  The defendant is present in court, as I

8    previously noted, along with his counsel, James Gomric.

9          Good morning, Mr. Gomric.

10         *MR. GOMRIC:*  Good morning, your Honor.

11         *THE COURT:*  Mr. Bechel, you were provided with a copy

12   of the presentence report.  That's true, isn't it, sir?

13         Mr. Bechel?

14         *MR. BECHEL:*  What?

15         *THE COURT:*  You got a copy of the presentence report,

16   true?

17         *MR. BECHEL:*  I think so, yeah.

18         *THE COURT:*  Well, "I think so" is not an answer that's

19   appropriate.  You did or did not get a copy of the presentence

20   report?

21         *MR. BECHEL:*  Yes.

22         *THE COURT:*  And did you take the opportunity,

23   Mr. Bechel to read through that presentence report?

24         *MR. BECHEL:*  I looked at it.

25         *THE COURT:*  You looked at it.

1          *MR. BECHEL:*  Yep.

2          *THE COURT:*  Now, when you looked at it, did you look

3     at each and every page, sir?

4          *MR. BECHEL:*  I don't recall if I did or not.

5          *THE COURT:*  You don't recall.

6          *MR. BECHEL:*  Why is that important?

7          *THE COURT:*  I won't ask the question if it wasn't

8     important.  Every statement I make, every question I ask, has

9     meaning, or I wouldn't.  The point of my question is, I want to

10    establish for the record that you took the opportunity to read

11    the presentence investigation report, which is an important

12    document in your case.

13         You did or did not read your report?

14         *MR. BECHEL:*  Yes.

15         *THE COURT:*  You went over it with Mr. Gomric?

16         *MR. BECHEL:*  Nope.

17         *THE COURT:*  Pardon me?

18         *MR. BECHEL:*  No.

19         *THE COURT:*  Mr. Gomric, did Mr. Bechel go over it?

20         *MR. GOMRIC:*  This document has been tendered to

21    Mr. Bechel, in terms of our undertaking a considered review

22    thereof.  It would not be a fair statement to say he and I have

23    done so, based on the current status of our relationship.

24         *MS. SCOTT:*  Your Honor, if I could add something also.

25    This is basically -- the PSR is basically the exact same PSR

1   that was filed when Mr. Stobbs was his counsel.  There is only

2   a couple minor differences.

3         *THE COURT:*  Mr. Bechel, did you go over it with

4   Mr. Stobbs?

5         *MR. BECHEL:*  Nope.

6         *THE COURT:*  Mr. Bechel, when you went over the report

7   and read through the report, did you find anything in the

8   record you found to be in error?

9         *MR. BECHEL:*  I sent it back to Mr. Stobbs, and I

10   outlined what I felt was wrong, and he did nothing about it.

11   So...

12         *THE COURT:*  What do you recall telling him was wrong?

13         *MR. BECHEL:*  Why don't you ask Mr. Stobbs that.

14         *THE COURT:*  I'm asking you.

15         *MR. BECHEL:*  He has the report, I don't.

16         *THE COURT:*  I'm asking you what you recall telling him

17   was wrong.

18         *MR. BECHEL:*  I went through it and outlined everything

19   that I felt was wrong.

20         *THE COURT:*  Generally speaking, what do you recall

21   that to be Mr. Bechel?

22         *MR. BECHEL:*  I don't recall everything.  It was too

23   much paperwork.

24         *THE COURT:*  And generally speaking, what do you recall

25   the issues to be that you thought were in error?

1      *MR. BECHEL:*  I don't recall everything.

2      *THE COURT:*  I'm not asking you to recall everything.

3    I'm asking you to recall generally the issues that you brought

4    up to Mr. Stobbs.

5      *MR. BECHEL:*  I just don't recall everything.  He has

6    the paperwork.  I went through it and sent it back to him and

7    so...

8      *THE COURT:*  I'm not asking you to tell me everything.

9    I'm asking you to tell me the general nature of the things that

10   you thought were in error; things like --

11     *MR. BECHEL:*  I don't remember.

12     *THE COURT:*  -- your background, your employment,

13   things having to do with the offense that you were convicted of

14   here.  What kinds of things do you -- did you tell Mr. Stobbs

15   about?

16     *MR. BECHEL:*  I don't recall.  I just went through it

17   and sent it back to him.

18     *THE COURT:*  I'm sorry?

19     *MR. BECHEL:*  I don't recall.  I sent it back to him.

20     *THE COURT:*  Mr. Gomric, when you went through the

21   report as Mr. Bechel's lawyer, did you --

22     *MR. GOMRIC:*  I did not want to interject, but I was

23   about to say, Judge, upon -- there's been two reports tendered

24   to me.  One was the original, which actually contained John

25   Stobbs' name.  There is a current report, which was promulgated

1    on August 3rd of 2010.  I've reviewed both of the documents.

2    Both of the documents have been tendered to Mr. Bechel.

3         They both appear to me to be proper in terms of their

4    form and substance.  Inquiry was made of Mr. Bechel or the

5    beginnings of an inquiry were made of Mr. Bechel as to the

6    propriety of the document, and there was, in essence, a

7    declination in terms of a response, and, as such, I will tell

8    the Court that the PSR appears to be proper, Judge.

9         *THE COURT:*  Now, when you say Mr. Bechel declined to

10   respond, did he simply tell you that he didn't -- he had no

11   intention to tell you whether or not anything in the report was

12   erroneous as far as he was concerned?  He just refused to

13   participate?

14        *MR. BECHEL:*  The fairest statement would be that it

15   was "What does it matter?" which is reflective of his prior

16   demeanor relative to certain things.  As to the prior situation

17   vis-a-vis Stobbs, my belief was to some extent a parallel of

18   what was recited by way of the pleading that we dealt with, oh,

19   about a month ago.

20        *THE COURT:*  The "What does it matter?" response seems

21   to be consistent with Mr. Bechel's demeanor throughout this

22   case.

23        Mr. Bechel, you know you can take two approaches.  And

24   you can participate and assist your lawyer, or you can waive

25   your participation with your lawyer and just not assist him.

1    And we will proceed.  But it's -- Mr. Bechel, it is your call.

2    I mean this -- the demeanor of "it doesn't matter" is something

3    that you certainly --

4         *MR. BECHEL:*  Then why didn't Mr. Stobbs do something

5    about it when I objected to it then?

6         *THE COURT:*  Well, ultimately, you fired Mr. Stobbs.

7         *MR. BECHEL:*  No, he quit.  He frickin' quit.  He quit

8    on me over the phone.

9         *THE COURT:*  Well --

10        *MR. BECHEL:*  And then threatened to testify against

11   me.  That's bullshit.

12        *THE COURT:*  Well, this record will reflect what

13   happened there, Mr. Bechel.  And once the lawyer is off the

14   case, he's certainly not going to file anything for you.  So...

15   But if you are not -- it will be severely to your detriment, so

16   I do strongly suggest that you cooperate through this

17   sentencing hearing.  So, according to Mr. Gomric, there is no

18   objection on the defense side to the presentence report.

19        *MR. BECHEL:*  It was mailed to me by him, and we never

20   went over it.  So that's...

21        *THE COURT:*  Ms. Scott, does the government have any

22   objections to the presentence report?

23        *MS. SCOTT:*  We do not, your Honor.

24        *THE COURT:*  All right.

25        *MR. GOMRIC:*  Your Honor?

1    THE COURT:  Mr. Gomric.

2    MR. GOMRIC:  If Mr. Bechel is desirous of

3    communication with me relative to any topic associated with

4    this document, the current document he's received, both in its

5    current form and in its previous form.  If it doesn't displease

6    the Court, I would be happy to spend five or ten minutes

7    discussing this document with him.  I don't mean to cause a

8    disruption in the proceeding, and I just wanted to make the

9    record clear that I'm amenable to having a further conversation

10   with Mr. Bechel should he so choose.

11   THE COURT:  The Court's more than happy to give you

12   all the time you need to go through the report with Mr. Bechel.

13   Mr. Bechel, do you want to go through the report with

14   your lawyer right now?

15   MR. BECHEL:  No, I don't.  First of all, when I came

16   in here he asked me if I joined the Air Force or was drafted.

17   What difference does that make?  And then he was asking me

18   about accommodations.  That was almost 30 years ago or more.

19   How am I supposed to remember all that stuff?  I joined the

20   military.  I wasn't drafted.  So what does that have to do with

21   all of this?

22   THE COURT:  Maybe he was just trying to make pleasant

23   conversation with you.  But my question of you now is, Do you

24   want to sit down with Mr --

25   MR. BECHEL:  No.

1      *THE COURT:* I certainly find Mr. Gomric's recitation

2  of what has transpired to be credible. Quite frankly,

3  Mr. Bechel, throughout the number of times that he's been in

4  court, and I've had hearings and an opportunity to interact

5  with Mr. Bechel -- have been any number of times when I have

6  found Mr. Bechel to be without credibility and have experienced

7  and observed specific instances when Mr. Bechel has

8  misrepresented things to this Court. So Mr. Gomric tells me

9  that he has offered to go through the presentence reports with

10  Mr. Bechel and he's refused. I accept Mr. Gomric's word on

11  that.

12      *MR. BECHEL:* I went through it and then made my

13  comments to Mr. Stobbs, and he didn't do anything so, you know.

14      *THE COURT:* I do not accept Mr. Bechel's

15  representations relative to what Mr. Gomric had to say on the

16  issue.

17      I'm not going to do it. Quite frankly, I think it --

18  the Court could in its -- in the course of the calculation of

19  the guideline range, given the number of misrepresentations, I

20  could easily make findings of fact that would justify an

21  enhancement for obstruction of justice and the -- and a -- to

22  clearly utilize the findings just on obstruction of justice

23  alone to remove the acceptance of responsibility in this case.

24      As I said, I'm not I'm going to do it because of

25  the -- I don't have before me all the transcripts where I could

1    make those specific findings.  But with those transcripts, I'm

2    confident there is more than enough instances where the Court

3    could make that finding.  Nonetheless, the Court will adopt the

4    findings of the probation officer and will go through those

5    findings right now.

6          The Court must analyze this case for purposes of

7    determining an appropriate sentence pursuant to 18 United

8    States Code, Section 3553(a).  In doing so, all appropriate and

9    relevant factors must be considered, which consequently means

10   an individualized sentence will result.  A thorough adversarial

11   test before the Court as contemplated by the sentencing --

12   federal sentencing procedures will be accomplished, and the

13   Court will grant adequate time to both sides to accomplish that

14   task.

15         The Supreme Court directs the trial judge to treat the

16   guidelines as the, quote, starting point and the initial bench

17   mark, closed quote.  The Court is prohibited by law of

18   presuming the reasonableness of a guideline sentence and will

19   not do so.  The sentencing guidelines will be considered as

20   advice to this Court.  Although in the *Gall* case, the Supreme

21   Court did instruct trial courts who choose to vary from the

22   guidelines to adequately explain those variances from the

23   guidelines.  In the words of the *Gall* court, the trial judge,

24   quote, must consider the extent of the deviation and ensure

25   that the justification is sufficiently compelling to support

1    the degree of the variance, closed quote.  The Court will

2    consider any aggravating or mitigating evidence or arguments

3    put forth by the parties.  And so as indicated, the Supreme

4    Court directs the trial court to look first to the correct

5    calculation of the guidelines.

6         Mr. Bechel, in this case, pled guilty to three counts:

7    Count 1 is sexual exploitation of a minor, pursuant to 18

8    United States Code, Section 2251(c)(1) and (c)(2)(B); that's a

9    class B felony.  Count 2, transportation of depiction of minor

10   engaging in sexually explicit conduct, pursuant to 18 United

11   States Code, Section 2252(a)(1), that is a class C felony.  And

12   Count 3 is possession of matter containing depiction of minor

13   engaging in sexually explicit conduct, 18 United States Code,

14   Section 2252 (a)(4)(B), a class C felony.

15        For the advice of the sentencing commission, we look

16   to the 2009 edition of the guidelines manual.  That manual, at

17   Section 3D1.2(b) guides the Court to group Counts 1, 2, 3

18   together as they are closely related involving the same victim

19   and two or more acts or transactions connected by a common

20   criminal objective or constituting part of a common scheme or

21   plan.

22        The guideline for violation of 18 United States Code,

23   Section 2251(c)(1)(B) is found at Section 2G.  That's upper

24   case G2.1(a), which calls for a base offense level of a 32.  It

25   is noted that the guideline for violations of 18 United States

1    Code, Sections 2251A(a)(1) and 2252A(a)(5)(B) is found at

2    two -- Section 2G2.2, for which subsection (c) Cross Reference

3    states that if the offense involved causing, transporting, or

4    permitting a minor to engage in sexually explicit conduct for

5    the purpose of producing a visual depiction of such conduct,

6    apply Section 2G2.1.

7        And so, as a result of all that, the base offense

8    level is a 32.  Since the offense involved the commission of a

9    sexual act or sexual conduct guideline section 2G2.1(b)(2)(A)

10   adds two levels to the offense level.

11       Since the offense involving the use of a computer or

12   an interactive computer service to persuade, induce, entice, or

13   to facilitate the travel of a minor to engage in sexually

14   explicit activity, or to otherwise solicit participation by the

15   minor of such conduct, or solicit participation with a minor in

16   sexually explicit conduct, the offense level again is increased

17   by two.  It is pursuant to 2G2.1(b)(6)(B).

18       No other enhancement, so the adjusted offense level is

19   a 36.

20       There is a Chapter 4 enhancement, however, because the

21   offense of conviction is a covered sex crime, and neither

22   U.S -- neither Section 4B1.1, nor subsection (a) of 4B1.1, 4 --

23   4B1.5 applies.  And the defendant engaged in a pattern of

24   sexual activity involving prohibited sexual conduct, so the

25   offense level is increased by five, the addition to the offense

1    level determined under Chapters 2 and 3.  So pursuant to

2    Section 4B1.5(b)(1), an offense level of 41 is actually

3    applicable, rather than the adjusted offense level of a 36.

4            The defendant demonstrated, as I alluded to earlier,

5    as accepting to responsibility, and the two-point acceptance of

6    responsibility is applied.  The government can move for a third

7    level if the government is so inclined.

8            Ms. Scott, does the government move for the third

9    level?

10           *MS. SCOTT:*  Yes, we do, your Honor.

11           *THE COURT:*  That motion is granted.  The total offense

12   level, then, is a 38.

13           So we look now to the defendant's history -- I'm

14   sorry -- criminal history as the second part of the guideline

15   calculation.  We see that the defendant was convicted in 1996

16   of contributing to the delinquency of a minor, which involved

17   purchasing alcohol for a person under the age of 17.  That is a

18   single point event for guideline purposes resulting in a

19   criminal history category of a I.

20           So the defendant's exposure is as follows:  With

21   respect to Count 1, it's a mandatory minimum 15 years, maximum

22   30 years; Count 2, mandatory minimum 5 years, maximum 20 years;

23   Count 3 not more than 10 years.  Supervised release range as to

24   all three counts, any term of years to life.  Probation is not

25   authorized in this case, of course, given the nature of the

1   statutory penalties. Fine range under the statutes, Counts 1,

2   2, and 3, maximum $250,000, or a maximum of three-quarters

3   million dollars.

4          Restitution is not an issue under the statute or the

5   guidelines. There was no cooperation from the victim in this

6   case to establish restitution. A 100-dollar special assessment

7   on each count under the statute, as will be the case under the

8   guidelines as well; so a 300-dollar total special assessment.

9          The advice from the sentencing commission is as

10   follows: With respect to a total offense level of 38 and

11   criminal history category I, as to Count 1, the guideline range

12   is 235 months on the low side, 293 months on the high side; the

13   same with respect to Count 2. Count 3, because of the

14   statutory cap of 10 years, the guideline range is simply 120

15   months. The guideline adopts the statutory cap because the

16   guideline range would be -- I'm sorry?

17        *MS. SCOTT:* Count 2 actually has a statutory cap of 20

18   years.

19        *THE COURT:* I'm sorry. You're right. It is 235 to

20   240 months. I misread that. I appreciate your bringing that

21   to my attention.

22          So Count 2 the guideline, once gain, adopts the

23   statutory cap, and so it is 235 to 240 months. Likewise, the

24   guideline for Count 3 adopts the statutory cap. So it's

25   simply -- rather than being 235 to 293 months, it is simply a

1    120-month guideline range.

2          Supervised release under the guidelines likewise is

3    any term of years to life for all three counts.  Probation's

4    not available under the guidelines either.  A fine range,

5    25,000, low side; 250,000 high side.

6          Special assessment, I already pointed out was $300

7    total.

8          So we look at the -- the statutory factors that I

9    think are relevant in this case:  Nature and circumstances of

10   the offense, history and characteristics of the defendant, need

11   for the sentence imposed to reflect the seriousness of the

12   offense, promote respect for the law, provide just punishment

13   for the offense, need to afford adequate deterrence to criminal

14   conduct, protect the public from further crimes of the

15   defendant.

16         The problem probably is an issue with respect to

17   medical care in this case.  Restitution, as I said, was not on

18   the table.  Neither are the kinds of sentences available.  We

19   must take into account whether to impose a guideline sentence

20   or not.

21         I think if I'm not mistaken, there still is the issue

22   of the government's motion for substantial assistance.  I don't

23   believe that's been withdrawn, but I'm not sure.

24         *MS. SCOTT:*  No.  It hasn't been withdrawn, your Honor,

25   and, in fact, I was going to ask the Court if I could take a

1    short break to speak with you concerning the motion.

2            *THE COURT:*  Sure.  Absolutely.

3            So we'll take a short recess, and let us know when you

4    are ready to resume.

5            *MS. SCOTT:*  Thank you, your Honor.

6            *THE COURT:*  We will be in short recess.

7                            *(Recess)*

8            *THE COURT:*  Okay.  So we're back in open court.  When

9    we took our recess, it was for the purpose of giving the

10   government the opportunity to determine whether or not they

11   wished to persist in their 5K1 motion.  So, Ms. Scott...

12           *MS. SCOTT:*  Thank you, your Honor.

13           Your Honor, the government has determined that it will

14   stick with the 5K1 motion that it added, despite Mr. Bechel's

15   unbelievable behavior today.  What he did was a really worthy

16   thing.  I mean, he provided information about a potential

17   threat to an agent, and we were able to get that agent --

18   notify the agency right away, get him protected, and start an

19   investigation.

20           *THE COURT:*  Let's talk about this.  We got -- and I

21   know that it's not the Court's role to look in depth at the

22   reason behind the substantial assistance motion of the

23   government.  But in the unusual circumstance here that that

24   particular case turned out to be one of this judge's cases.  So

25   I know very well what happened there because the Court had to

1    take that into consideration in that particular case.  Turned

2    out to be not a valid issue there.  I mean, the guy was

3    talking, and it turned out to be much of a case.

4         *MS. SCOTT:*  Well, it didn't.

5         *THE COURT:*  Almost as a hoax.

6         *MS. SCOTT:*  Well, I'm not sure if we're referring to

7    the same defendant.  Did you represent -- did you handle

8    William Sherman Kirkpatrick?

9         *THE COURT:*  Yes.

10         *MS. SCOTT:*  Okay.  I'm sorry.  I thought Judge Reagan

11    did.  I'm sorry.

12         *THE COURT:*  But and that's not so much here nor there.

13    At least Mr. Bechel put authorities on to the situation so that

14    they can investigate the case, whether a hoax or not, and I

15    understand that's worth something.

16         And, of course, it came up in Mr. Bechel's first plea

17    hearing, which he then decided not to go through with, canceled

18    the plea hearing.  He withdrew the 5K when it comes up.  We're

19    proceeding toward trial, and Mr. Bechel pleads guilty.  The 5K1

20    is filed again, and we go through that last court hearing in

21    which Mr. Bechel misrepresents a number of things, tells the

22    Court he didn't understand what was going on.  I went through

23    the transcript, which made it quite clear he did understand

24    what was going on.

25         In that pleading that he filed, he asked that the

1    federal charges be dismissed and the state charges be

2    dismissed, he be compensated for all the damages he has had to

3    suffer, and the damage to his reputation.  And, of course, in

4    this PSR, it outlines quite clearly that Mr. Bechel has been

5    molesting children nearly his entire adult life.

6             *MS. SCOTT:*  That's correct, your Honor.

7             *THE COURT:*  And, of course, then you make reference to

8    his behavior here in court today.  So...

9             *MS. SCOTT:*  Your Honor, if it were not for the fact

10   that this involved that threat to an agent, believe me I would

11   not be filing this 5K1.

12            *THE COURT:*  All right.  So this substantial assistance

13   that he rendered is -- is valued at what to the government?

14            *MS. SCOTT:*  Your Honor, I think this is something that

15   might need to be addressed at sidebar.

16            *THE COURT:*  On the record or off the record?

17            *MS. SCOTT:*  On the record, probably.

18            *THE COURT:*  Okay.

19            *(Following proceedings held at sidebar:)*

20            *MS. SCOTT:*  Your Honor, Mr. Gomric may not be familiar

21   with this, because, of course, Mr. Stobbs was the attorney at

22   the time.  The fact is we received information that there was a

23   death threat to an agent.  However, they were not going to

24   provide the name of the agent unless a deal was worked out.

25   That's what resulted in the agreement to file a 5K1, so that we

1    could get the agent's name ASAP rather than waiting.

2          Other than that fact, there was no way he was ever

3    going to be eligible for a 5K1.  And that's another reason why

4    we agreed to the 240 months, your Honor, to get the agent's

5    name.  Now, I just spoke -- I didn't want the Court -- I didn't

6    know if I should bring that up to the Court or not.  But we

7    felt like our hands were tied at that point.  Because it was

8    either wait, you know, till they decided to tell us who the

9    agent was and, in the meantime, have him be killed or work out

10   a deal with a child molester.

11         THE COURT:  Holy smoke.  That's some kind of

12   negotiation, I suppose.

13         MS. SCOTT:  If it wasn't for John, we would recommend

14   high end on this guy.  Definitely.

15         THE COURT:  You say if it wasn't for John?

16         MS. SCOTT:  Well, I mean, because he worked the deal

17   out.

18         MR. GOMRIC:  Okay.

19         MS. SCOTT:  And then we did -- and then Mr. Gomric.

20         MR. GOMRIC:  You are fine with me, kid.

21         MS. SCOTT:  -- with Mr. Gomric, I did indicate that we

22   would go ahead and stick with the original plan if Mr. Bechel

23   would plead.  Because initially we had withdrawn it because he

24   didn't give us a deadline.  But apparently he was -- I don't

25   know what to say, your Honor.  Frankly, the last three hearings

1   have been a complete surprise to me, his behavior.  So I don't

2   know what to do at this point, other than explain to the Court

3   why we're persisting in this 5K1.

4        MR. GOMRIC:  If I may.  I don't know if you want to

5   hear from me at all.  I would like --

6        THE COURT:  What I would like to hear, I think, is

7   your argument probably on the record.  But you can address the

8   specific issue here, but then I want to hear your full argument

9   on the record, I mean not at sidebar.

10       MR. GOMRIC:  That's fine.  This will be amplified in

11  the midst of the argument relevant to the 5K1, and that is this

12  individual's conduct is reflective of the absence of hope, and

13  I won't engage in undue speech-making.  But it while it's

14  frankly folly, it doesn't undercut what happened in the past.

15       Now, moving to what happened in the past, and since

16  we're making a record over here, obviously, the unusual manner

17  by way of which the information was garnered and the condition

18  of procedure, shall we say, for the transmission of that

19  information was negotiated by someone other than myself and,

20  frankly, not a course of conduct that I would -- you know,

21  enough said about that.  But so I just wanted there to be no

22  absence of clarity about who was representing Mr. Bechel at the

23  time that there was the "give the deal or you don't get the

24  name of the agent."

25       MS. SCOTT:  Oh, yeah.  Mr. Gomric was not involved.

1    MR. GOMRIC:  You know, is beyond that.  Since we're

2  over here talking, I can't figure out how I got involved in

3  this mess in the first place, given that the guy, when he did

4  the PSR, the bases for withdrawal is that "I might be a witness

5  in the case."  And, frankly, because I was at the PSR

6  interview, if you'll look at the PSR interview, the PSR says

7  the guy wouldn't talk about the case.  So why Stobbs could have

8  ever been a witness, I have no idea.  I hope you don't mind

9  that editorial comment.

10    MS. SCOTT:  Judge, I don't know.

11    COURT REPORTER:  I'm sorry.

12    MS. SCOTT:  I didn't know I could say that in open

13  court that's why I asked for a sidebar.  But we feel like that

14  we are bound by the plea agreement that we entered into, and

15  the fact is that we did it to ensure the safety of the agent.

16    MR. GOMRIC:  We appreciate that.

17    MS. SCOTT:  And Mr. Gomric did not have anything to do

18  with that.

19        (Following proceedings held in open court:)

20    THE COURT:  Are you -- have you completed your 5K

21  argument, Mrs. Scott?

22    MS. SCOTT:  Your Honor, I do believe that -- because

23  even though as the Court recognized, it did turn out to be a

24  lot of talk, but the expenses that were incurred, you know,

25  going to the different states, interviewing the different

1    people.  At the time we didn't realize that it was, you know,

2    going to turn out to be a hoax, and we were very worried for

3    the agent's life.  We believed that Mr. Bechel should receive

4    some consideration for providing that information to us.

5         Thank you, your Honor.

6         THE COURT:  Mr. Gomric, if you will, favor me with

7    your response to the 5K1 motion.

8         And before you start, Mr. Gomric, let me ask a couple

9    of questions, which are, I think, obvious but just kind of set

10   the parameters.  The government files a 5K1 motion.  You would

11   concede that the Court has the option of not granting it.  The

12   Court has the option of granting it, but granting it in an

13   amount of time the same, less than, or greater than the

14   government's request.  Agreed?

15        MR. GOMRIC:  I've heard a lot of testimony to that

16   effect over the years.  But, yes, I do agree, yeah.

17        THE COURT:  Okay.

18        MR. GOMRIC:  In the interest -- may I inquire of the

19   Court, does the Court want me to address USC 18 3553(a) factors

20   in --

21        THE COURT:  What I'd really like you to address right

22   now are just the 5K1 issues.

23        MR. GOMRIC:  Okay.

24        THE COURT:  And then let's separately talk about the

25   other issues.  And I understand there could be some overlap,

1    and I'm happy to hear some repetitive arguments.

2         *MR. GOMRIC:*  Yes, your Honor.

3         *THE COURT:*  But I want to zero in on -- and you heard

4    I mean, you know how it goes in this courtroom.  I'm prone to

5    laying my cards on the table, so you probably picked up some

6    tone of discord when I questioned Ms. Scott about why they were

7    persisting in their motions.

8         *MR. GOMRIC:*  One would not have to be a master of

9    observation to note said discord, Judge.  Frankly, it's

10   understandable, based on the record, based on the demeanor of

11   Mr. Bechel.

12        As I indicated at the sidebar, however, we have seen

13   conduct exhibited by an individual who at this juncture in his

14   life is absent hope.  Now, so that there is no ambiguity, he is

15   entirely fit but absent hope.  And hope is to most folks,

16   particularly folks facing circumstances akin to Mr. Bechel, all

17   that some people have.  And he has it not at this juncture.

18   And the conduct that he has exhibited in court is a byproduct

19   of that absence of hope.  It has been disruptive, it has been

20   off-putting.  But -- and it has resulted in the filing of

21   pleadings that have no merit in fact or law.

22        But they don't -- while they make one disinclined to

23   act upon the motion that was filed in keeping with their

24   agreement, and I want the record to note that I, on behalf of

25   Mr. Bechel, am more than appreciative that they're willing to

1    abide by that which was negotiated.  It doesn't diminish what

2    he previously provided.  And what he previously provided was in

3    point of fact substantial assistance.  At least at the time of

4    the provision thereof it had to be deemed substantial

5    assistance.  The mere fact that after vetting the claim it

6    proofed out not to be as significant as one might think, the

7    time of the utterance, it should and rightly was considered

8    cause for great concern.

9            In fact, as the Court is well aware, there's three

10   jurists up the chain of command from the court in Chicago

11   testifying right now about threats.  Any threat that involves a

12   government agent has to be regarded as serious.  And the fact

13   that he passed it on to his attorney, and then, in turn, it was

14   passed on -- albeit under what I regard as less than fortunate

15   circumstances -- was and is substantial assistance, and it does

16   merit a sentence reduction.

17           He cooperated.

18           In terms of the extent of the reduction that the Court

19   sees fit to grant, I hope that you grant the 60 months.  And I

20   don't know if you are -- if you want me to comment about -- in

21   detail about how much time we think he should receive.  But I

22   mean, if the Court's focus is should there be any reduction, I

23   think there should.  And I appreciate you hearing me on that

24   front.

25           Really, that's the best I can give you, Judge.

1      *THE COURT:*  Okay.  All right.

2           Ms. Scott, let's talk, then, about the statutory

3      factors.  And if the Court were to grant the 5K1 motion, what

4      factors would the Court be taking into consideration, and how

5      are those factors going to weigh on the Court's consideration?

6      One of the things that strikes this Court is that you have --

7      of the factors that I mentioned -- and it's not an unusual

8      circumstance.

9           But each and every one of the factors seems to be a

10     serious consideration for the Court's sentencing analysis:

11     the nature and circumstances of the offense, history and

12     characteristics of the defendant, the need for the sentence

13     imposed to reflect the seriousness of the offense, promote

14     respect for the law, provide just punishment for the offense,

15     afford adequate deterrence to criminal conduct, protect the

16     public from further crimes.

17          Each of those seem to play a significant role in the

18     Court's analysis.  So for starters, but for the substantial

19     assistance motion, there would be no reason to vary from the

20     guidelines.

21          *MS. SCOTT:*  I would agree with that.

22          *THE COURT:*  It would seem.

23          And I guess it would make no sense for you to argue a

24     high end guideline range and then vary.  I take it you would

25     argue the low end guideline range and then vary from there.

1    But I just wonder, I guess your argument is 235 minus 60.  Is

2    that what you're --

3              MS. SCOTT:  No, your Honor.  I'm sorry.  We were

4    recommending 20 years on Counts 1 and 2 and then 120 months on

5    Count 3.  And then the 60 months to be taken off of the 240

6    months that we were going to recommend.

7              THE COURT:  I see.  So you are recommending?

8              MS. SCOTT:  240 months on Counts 1 and 2, and 120

9    months on Count 3 to run concurrently, your Honor.

10             THE COURT:  Which comes out to 180 total.

11             MS. SCOTT:  Yes, sir, your Honor.

12             THE COURT:  All right.

13             MS. SCOTT:  And I can tell you some of the

14   considerations that the government -- some of the things the

15   government considered when it determined that a 20-year

16   sentence would be appropriate in this case.  While the

17   government acknowledges that the nature and circumstances of

18   this offense are horrible -- I mean, the fact is he -- a

19   56-year-old man traveled to Canada to have sex with a

20   15-year-old girl.  As noted in the PSR, he also is someone who

21   has a history of molesting children, including relatives of his

22   children -- relatives of his.

23             In fact, the government learned of the instant offense

24   because of the current pending state charges in Madison County

25   involving him inappropriately touching a six-year-old girl.

1    We believe, your Honor, based on his age, based on his

2    health, and based on the fact that he is still facing the State

3    charges of -- I believe it's predatory criminal sexual assault

4    involving the six-year-old victim, that a 20-year sentence

5    would be a sufficient sentence -- sufficient but not greater

6    than necessary to punish him for the offense that he committed

7    here.

8    He is 63.  And that's one of the things we considered,

9    is, you know, 20 years, he is looking at being 83 when he gets

10   out.  He's going to be less likely to recidivate, we hope.  And

11   hopefully at this point, since he has -- as is obvious from the

12   PSR -- gotten away with these things for so long, maybe finally

13   being punished for it will deter him from future abuse of

14   children.

15   So we also think a 20-year sentence will promote

16   respect for the law.  It will hopefully deter individuals from

17   seeking out minors to have sex with them, photographing the

18   minors in sexually explicit conduct, and then transporting

19   those images -- and possessing the images, and, in fact,

20   showing them to other individuals, your Honor.

21   Those were the main considerations.  Those were the

22   things the government considered when we decided not to ask for

23   the 293 but rather the 240.  We did not think a low end, the

24   235, was appropriate.  We thought 240 would be more appropriate

25   here because of the fact that he is still facing state charges.

1          *THE COURT:*  And I -- I am sorry.  And I take it you

2     are not aware of any pending deal that's contingent on the

3     federal disposition?

4          *MS. SCOTT:*  Your Honor, I have had contact with the

5     states attorney, and he has not indicated that there is any

6     potential deal based on what happens in the state *[sic]*.  All

7     he's told me so far is that their case is on hold until the

8     federal case is resolved.

9          So that's all I know about the state case, your Honor.

10    I do know that he is charged with three counts of predatory

11    criminal sexual assault.

12          With respect to remorse, the defendant has shown

13    absolutely no remorse for what he did in this case.  He's shown

14    no remorse for what he did for the Madison County case, for

15    anything that he's ever done.

16          In fact, I think one of the most terrible things I

17    read that just amazed me was that when he was confronted with

18    the accusation that he had molested -- I believe it was his

19    granddaughter -- he admitted putting his hand down her pants

20    once, but, you know, didn't admit the rest of it.  I mean, your

21    Honor, this guy has been doing this for the longest time.  He's

22    gotten away with it.  I don't know how.  He needs to be

23    adequately punished.

24          And the fact is, we took the case because when we

25    learned of the facts of the case we believed that he needed a

1  substantial sentence to deter him from committing further

2  crimes and to protect the children that are around him, to

3  protect the children that he comes into contact with.

4        *THE COURT:*  When I found -- what I found -- along

5  those same lines, what I found horrid was that one minor's

6  parents made her apologize to him.

7        *MS. SCOTT:*  Yes.  Your Honor, I'm not -- I'm going to

8  comment on the Madison County case, but that was a bothersome

9  subject also, your Honor.

10        One of the victims came forward after the allegations

11  were made about K.R.  And she was actually an older individual,

12  had been in the military, and began having nightmares and

13  recounting the abuse that she had suffered by Mr. Bechel.  This

14  was -- this is in Paragraph 38, your Honor.  It says she was

15  eventually released from the military and made several attempts

16  to take her life.  So he's affected these individuals for the

17  rest of their lives.

18        This K.R., I have the -- I mean, the utmost respect

19  for her.  The fact is, this girl reported this to her parents.

20  They made her apologize, and she still persisted until he was

21  brought -- finally brought to justice.  Well, he has not been

22  brought to justice yet, but he's been charged.  And the fact is

23  this little girl was strong enough, you know, to pursue that.

24  And I just -- I would just love to shake her hand, because I

25  think that was amazing that she did that after having to

1  apologize for that.

2        Another one of the things that really bothered me,

3  your Honor, is in the interview with Mr. Bechel, he indicated

4  his -- the sole purpose in going to Canada was to have sex with

5  this 15-year-old, that he knew she was 15.  He indicated that

6  he broke off the relationship with her because she wanted

7  something more, your Honor.  She wanted him to adopt her, and

8  all he was interested in was a sexual relationship.

9        Your Honor, I wish you could have seen the videotape

10 interview of the minor.  In fact, I probably should have

11 presented it at sentencing now that I think about it.  But the

12 fact is, you know, she's felt like she needed to do that

13 because she needed a father figure and that he would take her

14 back to America.  She had a horrible home life.  So this is

15 just a sad, sad, sad situation, your Honor.

16        And we think 240 months is adequate.  We do that

17 because of his health, his age, and the pending state sentence.

18        And we do still -- despite the horribleness of this

19 crime, despite his past behavior, your Honor, we do still

20 believe that the 5K1 is appropriate, even though it will bring

21 it to a 15-year sentence because of the information that he

22 provided with respect to the death threat to the agent.

23        Our hope, your Honor, is that when he does -- that

24 when he is released from prison, if he is released from prison,

25 that he won't -- he will no longer be a danger to the public.

1  And we believe a substantial sentence will deter others from

2  committing similar conduct.

3      *THE COURT:*  Thank you very much.

4      *MS. SCOTT:*  Thank you, your Honor.

5      *THE COURT:*  Mr. Gomric, your argument regarding

6  sentence at this point, please.

7      *MR. GOMRIC:*  The specific numbers recited to you by

8  Ms. Scott -- *i.e.*, 240 months initial down to 180 months -- by

9  way of the Rule 5K1 are by way of considered calculation on the

10  part of the prosecution in this case.  And I, on behalf of

11  Mr. Bechel, respectfully request that the Court abide by those

12  considered calculations and the plea agreement that was

13  brokered by and between the parties in an effort at avoidance

14  of trial.

15      The Court, at the outset of this last part of the

16  proceedings, talked of the 3553(a) factors, and I have

17  identified what I believe to be eight areas of focus worthy of

18  mention on my part; some of which involve more or less the

19  present, and many of which involve the past.

20      One thing that can be fairly said about how it is that

21  we've come here today is that Mr. Bechel's plea -- his change

22  of plea, more specifically -- avoided the necessity of a trial.

23  It can be debated the extent to which it reflects the

24  acceptance of responsibility, but he's been given that.

25      They moved actually for a third point.  So, I mean,

1    it's his change of plea, number one, it saved all of us.  And I

2    don't want to get into things monetary, you know, but it saved

3    us the difficulties appurtenant to the conduct of a trial.

4         Number 2, it saved 12 plus one or two the emotional

5    strain associated with having to view the subject matter of

6    these allegations.

7         And, Number 3, is a point that I would like to raise

8    to you.  I was listening yesterday afternoon on the computer to

9    an oral argument that had been made before the Seventh Circuit

10   by a U.S. attorney, and he raised an interesting point, and one

11   that I'd like to make to you today.  And that is that by way of

12   the change of plea, he avoided the further public display of

13   the regrettable images.  And the further public display of the

14   regrettable images, even to the jurors that were assembled, or

15   would have been assembled, and to court personnel and the like

16   actually would have served to further -- the term that was

17   employed was re-victimize the minor.

18        And I think it can be fairly said that by way of his

19   acceptance and by way of his change of plea that he alleviated

20   many, many burdens that would have accrued to a number of

21   individuals, and he allowed us to avoid the further

22   re-victimization of the minor.

23        Without being redundant I would -- well, I incorporate

24   by reference my prior statements as to his cooperation.  Would

25   that be fair enough?  I don't know if you need to re-hear them.

1      *THE COURT:*  No, sir, I agree.

2      *MR. GOMRIC:*  It is there.  It is what it is.  It is

3  for your consideration in meting out a sentence.

4          If I was playing the chess board from the other side,

5  I would have a quick response to this and I could see -- well,

6  he does have a benign criminal history, although there's many,

7  many pending allegations.  And they are part and parcel of this

8  PSR, which has not been objected to.  When you look at the

9  criminal history section and the criminal history category, he

10  does fall in a category I, and he does have only one prior

11  which hails from 1996, and it was a misdemeanor.

12          You have already heard about age and health, which I

13  think, frankly, are -- and rightfully should be -- the primary

14  driving factors behind the Court meting out an initial sentence

15  of 240 with a reduction to 180.  Because, you know, I haven't

16  undertaken a statistical analysis of this, but my guess is that

17  there are not many septuagenarians that are doing all that well

18  in the federal Bureau of Prisons, and it could well be that

19  today a life sentence is being handed down to Mr. Bechel.

20          I don't know.  Only time will tell.  And that's a lot

21  of where this guy's been coming from for the last -- well,

22  since this has been going on.  I mean, he feels as if all hope

23  is lost, as I said a moment ago.  I will speak further down the

24  road very briefly to hope.

25          One other point that I would emphasize is that to the

1    best of my knowledge, I don't think he disseminated the

2    unfortunate material.  I think it was brought back.  But I

3    don't think there was further -- well, shall we say display

4    anew or conveyance to third parties.  I don't know how much it

5    helps him, but it can't hurt him.

6              Looking at the past a little bit --

7         *THE COURT:*  I think there was something in the PSR

8    about him showing the pictures to other individuals; not

9    sending it over the Internet, but showing it to other people,

10   like, within his home.

11        *MR. GOMRIC:*  That may be fairly said, Judge.  My focus

12   was passing it on to other Internet servers.

13        *THE COURT:*  He did not do that.  I think did show it

14   to other people.

15        *MR. GOMRIC:*  Fair enough.  I stand corrected in that

16   regard.  I was looking through in anticipation of today's

17   hearing -- frankly, the guy had an unusual home life.  We've

18   all been doing this long enough that you can see during --

19   usually it's during prepubescense, frankly, that somehow, some

20   way that something went awry.

21             And if one examines Pages 13 and 14 of the PSR, there

22   was a split in the home when he was five.  He lived with his

23   mother for a period of time and then thereafter was sent to his

24   father's house.  Now, the part that strikes me as odd about --

25   particularly odd about the situation at home is what one

1   reads -- and I don't say this -- I'm not trying to make these

2   statements to the detriment of Mr. Bechel, and I hope they're

3   not taken as such.

4          But I say this in the way of explanation and in the --

5   for the purposes of the Court's analysis pursuant to 3553(a),

6   because I think that the Court can and rightly should look at

7   things that, frankly, were beyond the control of the defendant

8   when he was a minor child that may to some extent explain how

9   it is that he is before you today.

10         But if you look at the Paragraph 67 -- and I think

11  I've read this right, and obviously Mr. Bechel could enlighten

12  the Court further if he is so inclined.  He hasn't been so

13  inclined thus far.  But I think it reads his mother was the

14  sister of the defendant's stepmother, who was killed by her

15  husband.

16         Now, I don't know exactly when or how, but that's an

17  oddity, I mean.

18         THE COURT:  But you missed one thing.  Read the

19  previous sentence.  They came from Kentucky.

20         MR. GOMRIC:  Well, since we've begun to add a degree

21  of levity to the proceedings, there is one thing that should be

22  corrected.

23         THE COURT:  I did that for Molly's sake.  She is from

24  West Virginia, but she understands those Kentucky people too.

25         MR. GOMRIC:  We could talk about hoes down the road

1    and the spelling thereof.

2         *THE COURT:*  You are going someplace else.  I did see

3    that.  But bringing it back in line, I did see that, but one of

4    the things I noted about his background was that -- and I'm not

5    sure, and I guess we don't know because we don't have

6    psychiatric evaluation on this.  He was not abused as a child.

7    So I guess the question becomes, Does this part -- does this

8    aspect of his background, does that have some psychological

9    impact on him?  I mean, I don't know.

10        *MR. GOMRIC:*  I cannot tell you that there has ever

11   been a differential diagnoses by anyone of a professional

12   nature.  He spent time in the military.  There has been no

13   indication that there is a family line that is indicative of

14   things problematic.  All I'm doing is stating that which is

15   contained within the PSR in an effort to, perhaps, shed some

16   light on certain aspects of what we have here.

17        I had begun to say if one looks at the last line of

18   Page 14 -- and this -- it does indicate that he suffered a

19   stoke.  There should be, I think, an "r."

20        *THE COURT:*  Stroke.  Yeah.

21        *MR. GOMRIC:*  We don't need anybody poking at him any

22   more.

23        *THE COURT:*  I read it as stroke.  I didn't even notice

24   that the "r" was missing.

25        *MR. GOMRIC:*  Look, the measure of a man is all that --

1  all that he does or doesn't do during the time that the

2  almighty bestows upon him on this life or during this life and

3  on this planet, not just that which brings him before a judge

4  at sentencing.  And I really think that -- I mean, for time

5  immemorial that's been recognized and that is qualified both by

6  way of statute and the guidelines.  I mean, you have got to

7  look at everything that goes into this guy.

8       And one thing I do think that cuts in his favor is

9  that he joined the military.  I did get that much.  He joined

10  military service in '65, which at that point in time was a time

11  of war, and that he served honorably for three years.  And he

12  received some form of citations and/or decorations.  He lead --

13  he worked.

14       I hope and pray that the Court undertakes an

15  empathetic approach to sentencing this man, and I hope and pray

16  that the Court is willing to abide by that which we brokered,

17  which is 240 cut down to 180, and that the Court would also

18  consider a specific recommendation of either Springfield,

19  Missouri, or Lexington, Kentucky.  That is two hospital

20  facilities.  I think those would be the appropriate facilities

21  for this gentleman, and I appreciate you hearing me.

22       THE COURT:  On that specific issue, you know the

23  Bureau of Prisons has a tendency with a particular conviction

24  of record here to be inclined to place defendants of like

25  convictions together.  One of those places is Marion.  They

1  have a special unit there.  One of the reasons why they have

2  that special placement is for their own protection.

3       Another is -- I believe if I'm not mistaken, and

4  someone might be able to correct me -- Butner in -- I think

5  that's North Carolina.  And I'm not sure Butner may have a

6  hospital facility attached to it. I'm getting an indication of

7  no, maybe but -- so you have a double consideration there in

8  making that request, because there is a -- there is a -- there

9  is an element of seeking protection because of the nature of

10  the conviction.  And they have special facilities for

11  defendants convicted of these type of crimes.

12      *MR. GOMRIC:*  I have looked at the literature relative

13  to BOP load designation.  I'm not entirely sure whether either

14  of the two facilities referenced by the Court would have

15  medical facilities on-site that would meet the level of need

16  that I think is prevalent within this defendant.

17       In terms of safety, it is my belief relative to --

18  with particularity, Lexington, Kentucky, the hospital located

19  there, or the medical facility that's located there, that the

20  inmate population that is located at that facility is generally

21  speaking of the ilk such that I don't believe that they would

22  present an undue and ongoing threat to the defendant.  And,

23  basically, I want to ask you for Lexington, Kentucky.  And when

24  one balances his health needs against the possibility of having

25  problems with another inmate, I think his health needs might

1  take precedent over the other thing.

2      *THE COURT:* Let me also ask you another question, and

3  I don't know how closely you have looked at this. I find most

4  counsel tend not to focus on it. The probation officer who

5  prepared the presentence report suggests to me the defendant

6  can afford a fine within the guideline range.

7      Have you looked at that, Mr. Gomric?

8      *MR. GOMRIC:* In the realm of my appointments --

9  Mr. Bechel -- I have examined the financial aspects of this

10  document. And in the realm of appointments, Mr. Bechel is, to

11  a certain extent, uniquely situated in that he has resources

12  that are much larger than most of the folks I get appointed to.

13  But, yeah, I have looked at it.

14      *THE COURT:* Would you argue to the contrary the

15  probation officer's recommendation?

16      *MR. GOMRIC:* I have no information either by way of my

17  investigation or by way of submission from the defendant that

18  contraindicates that which is contained within the PSR.

19      *THE COURT:* Thanks.

20      Mr. Bechel, you have a right to address the Court

21  prior to sentencing, and I invite you to do so at this time.

22      *MR. BECHEL:* I don't want to.

23      *THE COURT:* Ms. Scott, any rebuttal remarks or other

24  comments?

25      *MS. SCOTT:* I just had a couple. Your Honor, while

1    Mr. Gomric is correct that preventing a trial would -- did

2    prevent the photos of S.K. being displayed, I disagree with his

3    comment that the victims are not going to suffer further

4    victimization.  Because they're already suffering, and they're

5    going to continue to suffer for the rest of their lives from

6    the abuse, the molestation that they suffered at the hands of

7    Mr. Bechel.

8         S.K. is ashamed.  That's why she did not want to

9    cooperate.  You have his -- I believe it was his -- L.D. was

10   his stepdaughter.  You have her saying that when she was seven

11   he began sexually molesting her.  This is Paragraph 36, your

12   Honor.  She had suppressed the memories, when she began having

13   flashbacks while in the military and made several suicide

14   attempts.  That was repeated again in Paragraph 38, your Honor.

15        In Paragraph 39, the mother of L.D. advises that she

16   didn't realize what was going on at first, but she eventually

17   left Mr. Bechel after she discovered a picture of one of

18   Mr. Bechel's daughters sitting in a chair nude with her legs

19   spread open.

20        *MR. BECHEL:*  I object to that right there.  That's not

21   true.

22        *MS. SCOTT:*  So anyway he -- you know, this is a mom

23   that got it, actually got it, and took her daughter away from

24   Mr. Bechel at the time.  When he was interviewed regarding the

25   allegations by L.D., he did admit that he put his -- he took

1    her hand and put it on his penis.  But, of course, he said it

2    only occurred for a second.

3         These people are going to be victimized for the rest

4    of their lives.

5         K.R., you know, first being forced to apologize, and

6    now she is going to possibly have to testify at the Madison

7    County trial.  She was six years old when this happened.  There

8    was some evidence, although we cannot prove it, as set forth in

9    Paragraph 47 that he had taken pictures of a vibrator being

10   inserted into a vagina.  We believe that it might have been

11   K.R., but, you know, first off, we didn't want to put her

12   through any more trauma by trying to get her to look at the

13   pictures or anything like that, your Honor.  So we are not sure

14   if that was a minor -- if that was her or not.

15        It just shows that, you know, this was not an isolated

16   incident.  You know, he took pictures not only of S.K. but of

17   this minor victim.  He showed the nude images of S.K. to the --

18   K.R.'s father.  That's how we found out about the case.  That's

19   how the Feds became involved in the case, is when the

20   allegations against K.R. came out, K.R.'s father reported that

21   Mr. Bechel had showed him a video and photos of him having sex

22   with a teenager in Canada.

23        So when you look into -- and I think what's especially

24   sad, and I mentioned it before, your Honor.  If you look at

25   Paragraph 30 of the PSR and you look at S.K.'s first interview,

1    she states she was under the impression that she needed to do

2    what it took to make sure she was cared for, so she at that

3    point began to have sex with Mr. Bechel.  Apparently, according

4    to her interview, she believed that this was going to be -- he

5    was going to be her father, a father figure to her, someone who

6    would take her in.

7           When you consider the measure of a man, your Honor,

8    and you are looking at Mr. Bechel, you are looking at a man who

9    has molested children for years and years and gotten away with

10   it.  And if it were not for one brave little girl, he would

11   still be getting away with it.  We never would have known about

12   S.K. and some of the other individuals who we learned about

13   later.  We might never have learned about them, your Honor.

14   And a stiff sentence here might give them some feeling of

15   justice, although, again, I believe that they're going to be

16   victimized for the rest of their lives because of what happened

17   to them.

18          Your Honor, we do believe that the 240-month sentence

19   is appropriate.  We ask for a lifetime supervised release when

20   he's -- because we do believe that Mr. Bechel -- we would hope

21   that he would at the time that he is released no longer

22   participate in this activity, but we would like him to be

23   supervised to ensure that he does not participate in such

24   activities.  The fine amount we will leave to the discretion of

25   the Court, and we would ask -- and, of course, there is a $300

1   special assessment, your Honor.

2          THE COURT:  When you say the 240 months, you are

3   indicating 240 less the amount of your requested 5K1.

4          MS. SCOTT:  Right.  If the Court grants our 5K1, then

5   our recommendation then would go down to the 180, your Honor.

6          THE COURT:  I understand.  Okay.  Thank you very much.

7          MR. BECHEL:  Can I speak?

8          THE COURT:  Absolutely, you can speak.  Would you come

9   up to the podium, please?

10          MR. BECHEL:  I can't.  My foot hurts.

11          THE COURT:  Okay.  Would you just make sure his

12   microphone is on there, Mr. Gomric?

13          MR. BECHEL:  Under the Sixth Amendment --

14          THE COURT:  Would you pull the microphone closer to

15   him?

16          MR. BECHEL:  Under the Sixth Amendment, I have a right

17   to face my accusers.  All these statements or whatever you are

18   saying is fact is statements.  They're not -- nothing has been

19   proven yet, and you are using those all for facts.  And,

20   furthermore, the girl from Canada wanted me to adopt her so she

21   could go to California to live with another man, you know, that

22   I think was 52 or 53 years old that worked for the TSA as an

23   agent there.  So why ain't something being done to him, you

24   know?  And this is -- everybody knows this is fact or

25   statements or whatever, you know.

1          THE COURT:  Okay.  Thanks, Mr. Bechel.

2          The Court previously indicated that there are a number

3     of factors that the Court finds to be relevant.  The first, of

4     course, is nature and circumstances of the offense.  The

5     defendant, as previously pointed out, has been convicted by

6     virtue of his guilty plea in this case of three very serious

7     counts of sexual exploitation of a minor, transportation of

8     depiction of a minor engaging in sexually explicit conduct, and

9     possession of matter containing depiction of minor engaging in

10    sexually explicit conduct; all very serious offenses and

11    offenses which must be dealt with in a serious fashion.  The

12    defendant sought out this sexual relationship with the minor.

13    He did this over the Internet.  He went to --

14          MR. BECHEL:  First of all, let me --

15          MR. GOMRIC:  Shush.

16          MR. BECHEL:  All right.

17          THE COURT:  He went to -- Mr. Bechel, I gave you the

18    opportunity to speak --

19          MR. BECHEL:  It's all right.

20          THE COURT:  -- and now it's my opportunity to speak,

21    analyze, and explain the sentence that I'm going to impose.

22          He sought out this person through the Internet, met

23    her over the Internet, went to Canada specifically for the

24    purpose of engaging in sexual conduct with her, recorded

25    sexually explicit scenes with her by virtue of using his

1    camera, downloaded those when he brought the camera back to the

2    United States on his computer, and in that way committed his

3    crime to which he pled guilty; a very serious offense --

4    offenses.  And the defendant now must face the impact of having

5    committed these serious crimes.

6          History and characteristics of the defendant:  The

7    defendant by virtue of his history and characteristics is

8    clearly a sexual predator.  The counsel for the defendant, who

9    by his knowledge and experience has proven to be an

10   extraordinary defender of federal defendants, has done the best

11   possible job one could do in a case such as this.  Talked about

12   the loss of hope and how the defendant's disruptive behavior

13   throughout this case demonstrates a loss of hope.

14         While I believe firmly that this was an extraordinary

15   act of advocacy on Mr. Gomric's part, I choose to disagree with

16   his interpretation of Mr. Bechel's behavior.  While I think it

17   reflects to some extent -- that is Mr. Bechel's behavior -- the

18   loss of hope, I think the better interpretation of Mr. Bechel's

19   behavior is much more like that of a person, even a child who

20   for years and years gets away with something and then suddenly

21   a person in authority decides or when one becomes aware of the

22   behavior that is either inappropriate or in this case illegal

23   comes to -- that behavior comes to the attention of the person

24   in authority, tells the person you can no longer get away with

25   this behavior.  And the wrongdoer becomes upset, becomes

1    defensive.

2            And the offender does not understand -- or fully

3    understands -- and says, I'm upset that I can no longer get

4    away with this behavior.  I've gotten away with this behavior

5    for years and years, and now all of a sudden you are telling me

6    that I can't engage in this behavior.  This upsets me.  It

7    bothers me.  It makes me mad.  Why don't you just mind your own

8    business and let me continue to engage in this behavior --

9    illegal or not -- like I've been doing for years and years and

10   years, because it's what I want to do.  And I don't care

11   whether it's illegal or not.  This is behavior that I have been

12   engaging in, and I want to keep doing it, and I'm mad that you

13   are not going to let me continue to engage in this illegal

14   behavior.  That's what I think is going on with Mr. Bechel.

15           The lawful authorities have upset his apple cart.

16   He's no longer able to engage in his sexual predatory acts,

17   and, of course, he has -- whatever it is that drives him to

18   engage in that behavior hasn't stopped, and since he is no

19   longer to engage in the behavior, he is lashing out at those

20   who are stopping him from engaging in that behavior.  And all

21   who are connected with the process are guilty of keeping him

22   from engaging in that behavior.

23           Part of the reason why I believe in this is, as

24   Ms. Scott pointed out, he shows absolutely no remorse for the

25   victims of his dastardly crimes.  He's not -- quite frankly,

1   despite the Court's willingness to grant him acceptance of

2   responsibility because of the timing of his plea, he shows no

3   true acceptance of responsibility.

4        He's done everything he could to try to take away the

5   effect of his plea.  He's filed frivolous motions.  He's been

6   obstructive on numerous occasions.  He's lied to the Court.

7   He's engaged in obstructive behavior toward counsel, toward the

8   prosecutor, toward the Court.  He's shown absolutely no remorse

9   toward his victims.  And so while he may have some loss of

10  hope, his behavior has demonstrated more the loss of his

11  feeling toward the loss of his inability to engage in his

12  sexually predatory behavior.

13       As Ms. Scott pointed out, he's been engaging in this

14  behavior for years and years, and one can only characterize him

15  as a sexual predator.

16       Clearly, then, when looking at the last two factors,

17  one sees that the next factor demonstrates this need for the

18  sentence imposed to reflect the seriousness of the offense,

19  promote respect for the law, and provide just punishment for

20  the offense.  And one can only conclude that that must result

21  in a significant prison sentence in excess of the statutory

22  minimums in this case.

23       Likewise, the need to afford adequate deterrence to

24  criminal conduct and the need to protect the public from

25  further crimes of the defendant, both this defendant and others

1    similarly situated must understand that they cannot perpetrate

2    these crimes on members of the community around them without

3    having imposed upon them substantial penalties of substantial

4    sentences.

5         Now, we come to, then, that where we start before

6    considering the government's substantial assistance motion.

7         I agree with the government, as to defense counsel, it

8    would seem that a 240-month sentence is the appropriate

9    starting point to adequately address the issues that I have

10   been discussing for Counts 1 and 2.  And the maximum 120-month

11   sentence for Count 3, clearly, the guideline system has

12   appropriately advised the Court in this regard.

13        There is absolutely no reason, absent the 5K1 motion,

14   to vary below the guideline on any sentence in that respect.

15   Because this is the defendant's first time in court, though he

16   has a long, long history of sexually predatory behavior, the

17   Court likewise believes it would be inappropriate to vary above

18   the guideline as well.  So the 240-month sentence would be the

19   appropriate starting point.

20        So the Court's consideration of the government's 5K1

21   motion is this:  While I believe the government would have had

22   appropriate reason to withdraw the 5K1 motion.  Because of the

23   defendant's frivolous motions, his withdrawing from the plea

24   agreement in the first instance, and his attempt to have the

25   court, for frivolous reasons, dismiss his federal charges,

1    state charges, and impose damages after his second plea and the

2    many misrepresentations to the Court, the Court understands the

3    reasons for the 5K1 motions and the government sticking by its

4    agreement in the first instance.

5             So the Court will grant the 5K1 motion.

6             However, in light of all the things I just mentioned

7    and in light of the nature of the offenses and the defendant's

8    history and characteristics, as well as the need to ensure that

9    an adequate sentence of punishment is imposed in the case, the

10   Court declines to grant the 5K1 motion to the extent suggested

11   by the government.  Therefore, the Court will reduce the

12   defendant's sentence by 40 months instead of 60 months.

13   Because I find that a sentence of 200 months will more

14   adequately address the factors set out by the sentencing

15   statute.

16            And so the sentence that will be imposed by this Court

17   momentarily and formally will be a 200-month sentence in Count

18   1, a 200-month sentence in Count 2, and a 100-month --

19   120-month sentence in Count 3, all to run concurrently and

20   based on the reasoning and the analysis I previously set out,

21   as qualified by the 5K1 motion filed by the government and

22   reduced for the reasons set out by the government.

23            The supervised release term that will be imposed in

24   this case will be a term of life on supervision imposed on each

25   of Counts 1, 2, 3.  The fine in this case will be the minimum

1  fine set out by the advice suggested by the guideline, as I

2  find no reason to vary from that advice, and that is a $25,000

3  fine.

4          Special assessment is obligatory in this case, which

5  is a 100-dollar per count for a total of $300.

6          Ms. Scott, do you have any questions or comments

7  before I formally impose sentence?

8          *MS. SCOTT:*  No, your Honor.

9          *THE COURT:*  Mr. Gomric, do you have any questions or

10 comments before I formally impose sentence?

11         *MR. GOMRIC:*  Thank you.  No.

12         *THE COURT:*  The Court, having then considered all the

13 information in the presentence report, including the guideline

14 computations and the factors set forth in 18 United States

15 Code, Section 3553(a), and the government's 5K1 motion, and

16 pursuant to the Sentencing Reform Act of 1984, it is the

17 judgment of the Court that the defendant, Larry A. Bechel, be

18 committed to the custody of the Bureau of Prisons to be

19 imprisoned for a term of 200 months on Count 1, 200 months on

20 Count 2, and 120 months on Count 3, all such terms to be served

21 concurrently.

22         It is ordered that the defendant shall pay the United

23 States a special assessment of $300.  The special assessment is

24 payable through the clerk of the United States district court.

25 It is further ordered that the defendant shall pay the United

States a total fine of $25,000, consisting of $8,333 on each of Counts 1 and 2 and $8,334 on Count 3. The fine is due immediately.

Upon release from imprisonment, the defendant shall be placed on supervised release for life with respect to each of Counts 1, 2, and 3, all such terms to run currently. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the United States probation office in the district to which the defendant is released.

While on supervised release, defendant shall not commit another federal, state, or local crime and shall comply with the standard conditions that have been adopted by this Court.

The defendant shall refrain from any unlawful use of a controlled substance. As the defendant has no known history of substance abuse, the requirement for mandatory drug testing shall be suspended. The defendant shall not possess a firearm or destructive device and shall cooperate in the collection of DNA as directed by the probation officer, which is required by law. Defendant shall register under the Sex Offender Registration and Notification Act and comply with the requirements of the act.

In addition, the defendant shall comply with the following special conditions: Pay any financial penalty that is imposed by this judgment and that remains unpaid at the

1　commencement of the term of supervised release.  Having

2　assessed the defendant's ability to pay, payment of the total

3　criminal monetary penalties shall be paid in equal monthly

4　installments of $500 or 10 percent of his net monthly income,

5　whichever is greater, over a period of approximately 51 months

6　to commence 30 days after release from imprisonment to a term

7　of supervision.

8　　　　　The defendant shall provide the probation officer and

9　the financial litigation unit of the United States attorney's

10　office with access to any requested financial information.

11　Defendant is advised that the probation office may share

12　financial information with the financial litigation unit.

13　Defendant shall apply all monies received from income tax

14　refunds, lottery winnings, judgments, and/or any other

15　approximated or unexpected financial gains to the outstanding

16　court-ordered financial obligation.  The defendant shall

17　immediately notify the probation officer of the receipt of any

18　indicated monies.

19　　　　　Upon -- while on supervised release, the defendant

20　shall participate in an approved sexual offender treatment

21　program at his own expense, as directed by the probation

22　officer.  If deemed necessary, the defendant shall submit to an

23　approved sexual predator evaluation.  Defendant shall abide by

24　all rules, requirements, and conditions of the treatment

25　program, including the submission to polygraph and/or

1  plethysmograph examination at his own expense to determine

2  compliance with the conditions of release.  Defendant shall

3  remain in the program until successfully completed or until

4  such time the defendant is released from the program by the

5  Court and/or a probation officer.

6          Defendant shall permit the probation officer to have

7  access to any personal computer and/or electronic device

8  capable of accessing the Internet, worldwide web, or electronic

9  mail.  The defendant shall also allow the probation officer or

10  designee to conduct regular searches on his computer using

11  software monitoring devices, if determined necessary by the

12  probation officer.

13          While on supervised release, defendant shall advise

14  the probation officer of all e-mail addresses used on both

15  public and private computers.  To finish up, consent to

16  third-party disclosure to any employer or potential employer

17  concerning any computer-related restrictions that may be

18  imposed.  Defendant shall warn other residents or occupants of

19  his home that computer systems will be subject to inspection by

20  the probation officer and/or authorized contractor.

21          Due to the nature of this offense, the defendant shall

22  submit his person, residence, real property, place of business,

23  computer, vehicle -- or a vehicle to a search conducted by the

24  United States probation officers at a reasonable time, in a

25  reasonable manner, based upon a reasonable suspicion of

1    contraband or evidence of a violation of a condition of

2    supervision.  Failure to submit to a search may be grounds for

3    revocation.  The defendant shall inform the other residents

4    that the premises may be subject to a search pursuant to this

5    condition.

6         The sentence varies from the guideline range upon the

7    motion of the government as a result of the defendant's

8    substantial assistance.

9         Mr. Bechel, you can appeal your conviction if you

10   believe that your guilty plea was somehow unlawful or

11   involuntary or if there is some other fundamental defect in the

12   proceedings that was not waived by your guilty plea.  You also

13   have the statutory right to appeal your sentence under certain

14   circumstances, particularly if you think the sentence is

15   contrary to law.

16        However, a defendant may waive those rights as part of

17   a plea agreement.  You have entered into a plea agreement which

18   waives some or all of your rights to appeal the sentence

19   itself.  Such waivers are generally enforceable, but if you

20   believe the waiver is unenforceable, you can present that

21   theory to the appellate court with few exceptions.

22        Any notice of appeal must be filed within 14 days of

23   judgment being entered in your case.  If you are unable to

24   afford the services of an attorney to handle the appeal,

25   counsel will be appointed for you.  If you cannot afford any

1    transcript of the record in the case, it will be prepared for

2    such appeal at the government's expense.  The clerk of court

3    can and will file a notice of appeal on your behalf.

4         They don't do that automatically, though, only if you

5    specifically and directly ask them to do that.

6         If notice of appeal is filed and Mr. Gomric is still

7    your attorney of record, then he remains your attorney of

8    record until such time as the Seventh Circuit names a different

9    attorney.

10        Mr. Bechel, do you have any questions about the appeal

11   rights I just outlined for you?

12        *MR. BECHEL:*  Nope.

13        *THE COURT:*  Anything else I need to cover, Melissa?

14        *PROBATION OFFICER:*  No.

15        *THE COURT:*  Sandy?

16        *COURTROOM DEPUTY:*  Jimmy mentioned Lexington.  Do you

17   want to recommend that?

18        *THE COURT:*  Yeah.  We will recommend Lexington.  But

19   let me work on the language with you on that, Sandy, so we can

20   try to take into account the protection issues as well.

21        Anything else, Ms. Scott?

22        *MS. SCOTT:*  No, your Honor.

23        *THE COURT:*  Mr. Gomric, anything else that you want to

24   put in the record?

25        *MR. GOMRIC:*  Mr. Bechel and I appreciate your time,

1    Judge.  Thank you.

2         *THE COURT:*  Okay.  We stand adjourned.

3                        -oOo-

4                REPORTER'S CERTIFICATE

5    I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
for the U.S. District Court, Southern District of Illinois, do
6    hereby certify that I reported with mechanical stenography the
proceedings contained in pages 1 - 57; and that the same is a
7    full, true, correct and complete transcript from the record of
proceedings in the above-entitled matter.

8
         DATED this 4th day of December, 2013.
9

10                    s/Molly Clayton, RPR, FCRR

11                    _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25