1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3    UNITED STATES OF AMERICA,          )
                                        )
4                      Plaintiff,       )
                                        )
5         vs.                           ) No. 09-cr-30007-DRH
                                        )
6    LARRY A. BECHEL,                   )
                                        ) November 30, 2009
7                      Defendant.       )

8
                         **TRANSCRIPT OF PROCEEDINGS**
9                        **MOTION TO APPOINT COUNSEL**
                    **BEFORE THE HONORABLE DAVID R. HERNDON**
10                  **CHIEF UNITED STATES DISTRICT COURT JUDGE**

11   **APPEARANCES:**

12   For the Plaintiff:          Angela Scott, Esq.
                                 Assistant U.S. Attorney
13                               9 Executive Dr., Suite 300
                                 Fairview Heights, IL  62208
14                               (618) 628-3700

15   For the Defendant:          John D. Stobbs, II, Esq.
                                 Stobbs Law Offices
16                               307 Henry St., Suite 21
                                 Alton, IL  62002
17                               (618) 462-8484

18   Court Reporter:             Laura A. Esposito, RPR, CRR
                                 U.S. District Court
19                               750 Missouri Avenue
                                 East St. Louis, IL  62201
20                               (618) 482-9481

21

22

23

24        Proceedings recorded by mechanical stenography;
     transcript produced by computer.
25

```
 1        (Court convened)
 2            THE COURT:  Let the record reflect that we're in
 3   open court.  We've called the case of United States of
 4   America vs. Larry Bechel, 09-30007.  Government present,
 5   represented by Assistant United States Attorney
 6   Angela Scott.  Good morning, Ms. Scott.
 7            MS. SCOTT:  Good morning, Your Honor.
 8            THE COURT:  Defendant is present in court together
 9   with his counsel, John Stobbs.  Good morning, Mr. Stobbs.
10            MR. STOBBS:  Good morning, Judge.
11            THE COURT:  Good morning, Mr. Bechel.
12            THE DEFENDANT:  Good morning.
13            THE COURT:  The case is set on defendant's pro se
14   motion for withdrawal of his counsel.  Mr. Stobbs has filed
15   a response to the motion in which he asks that the matter be
16   set for hearing.
17            Mr. Stobbs, what's your position in this matter?
18   Your client has made a number of allegations which, frankly,
19   don't go to the matter at hand, I think, but what's your
20   position on the --
21            MR. STOBBS:  Judge, I don't like to be in a
22   situation where the client who's retaining me -- and I've
23   reached the point where I've done what I was asked to do and
24   then everything gets unraveled.  It's an uncomfortable
25   situation.  He made statements, he made inculpatory
```

 1    statements in my presence to a probation officer who can be

 2    called at trial as a witness.  After I filed a motion I

 3    thought about it and I talked to some other people, and it's

 4    no different than, had he proffered in my presence, I'd be a

 5    witness at trial, so I don't think that I have any other

 6    alternative.

 7          I don't want to do it, but I think that just in

 8    terms of the record that I'd have to ask to withdraw because

 9    I think that ultimately the agreement that we reached and

10    that was -- you know, everything was done as we agreed to.

11    That's going to come up at a trial and I'd be very

12    uncomfortable sitting at counsel table having to be in that

13    situation.

14          THE COURT:  Okay.  Mr. Bechel, would you come to

15    the podium, please.

16          Mr. Bechel, you talk about quite a lot of things in

17    your motion asking that you need a new lawyer.  You also

18    indicated that you now cannot afford a new lawyer.  It's

19    clear to me that from what Mr. Stobbs said, that we're going

20    to have to grant your request that Mr. Stobbs be removed

21    from the case, quite frankly, for reasons other than those

22    that you cite in your motion.

23          But I need to talk to you about your current

24    financial situation so I need you to raise your right hand

25    and take an oath, please, Mr. Bechel.

1        *(Defendant sworn)*

2            THE COURT:  Mr. Bechel, do you own property

3    somewhere?  You own a house of some kind?

4            THE DEFENDANT:  Yes, I do.

5            THE COURT:  Is that house free and clear of any

6    encumbrances, any mortgages, loans?

7            THE DEFENDANT:  It's paid off but I signed it over

8    to my daughter.

9            THE COURT:  When did you do that?

10           THE DEFENDANT:  Ask John.  He had me sign the

11   papers.

12           THE COURT:  I'm asking you, sir.

13           THE DEFENDANT:  Two months ago, three months ago.

14   Couple months ago.

15           THE COURT:  Why did you turn it over to your

16   daughter?

17           THE DEFENDANT:  Because he wanted me to.

18           MR. STOBBS:  No.  I got a letter from Jay Tomrill

19   [ph.].  His daughter had gone to Jay Tomrill, that

20   apparently he and his daughter had -- I don't have my entire

21   file with me but I can file that with the Court, that I

22   guess Mr. Bechel and his daughter wanted to have the house

23   transferred over to his daughter.  Jay sent me a quitclaim

24   deed.  I sent that to Mr. Bechel and he signed it.  Then I

25   took one so he could sign it in my presence because I wanted

1    to make sure that it was in my presence.

2          THE COURT:  So Mr. Bechel, let me remind you that

3    you're under oath.  If you don't tell me the truth you could

4    be charged with perjury.  So why did you want to turn the

5    house over to your daughter?

6          THE DEFENDANT:  I mean I'm locked up and everybody

7    said to do it.  You no, he said to do it, so I did it.

8          THE COURT:  So who's "everybody"?

9          THE DEFENDANT:  The lawyers and every -- this

10   lawyer and everybody else, you know.

11         THE COURT:  So what was your understanding of why

12   they said to do it?

13         THE DEFENDANT:  Just do it.

14         THE COURT:  Why?  So you didn't have the asset in

15   your name any longer?

16         THE DEFENDANT:  You mean the -- I mean what am I

17   supposed to do with it, you know?  I don't follow what

18   you're asking me here.

19         THE COURT:  Well, I'm trying to determine whether

20   you have the assets to hire another lawyer or not.  Now, if

21   you have purposely rid yourself of assets so that you don't

22   have any assets any longer --

23         THE DEFENDANT:  No, I didn't do that.  No, there's

24   no way I would do that, you know.

25         THE COURT:  No, I don't know.

 1              THE DEFENDANT:  Well, no, I didn't.

 2              THE COURT:  I'm asking you questions.

 3              THE DEFENDANT:  No, I didn't do that.

 4              THE COURT:  So now your daughter has ownership

 5     interest in the house that you once owned?

 6              THE DEFENDANT:  Right.

 7              THE COURT:  Do you have any idea how much that

 8     house was worth or is worth?

 9              THE DEFENDANT:  Sixty, 70,000.  I don't know.

10     Maybe more.  I don't really know.  I don't know what it's

11     worth.

12              THE COURT:  Is she living there now?

13              THE DEFENDANT:  No.

14              THE COURT:  What's being done with the house?

15              THE DEFENDANT:  It's just sitting there.

16              THE COURT:  Is she trying to sell it?

17              THE DEFENDANT:  No, not yet.

18              THE COURT:  Do you own any vehicles?

19              THE DEFENDANT:  Yes, I do.

20              THE COURT:  And what kind of vehicles do you own?

21              THE DEFENDANT:  2004 F-150 truck and some

22     motorcycles and scooters and stuff.

23              THE COURT:  What kind of motorcycles?

24              THE DEFENDANT:  I think it's a 2005 Harley.  It's

25     worth about -- I paid 9,000 for it.  That was in '06, I

1    think it was.  I don't know what it's worth.  Five thousand.

2    I don't know what it's worth.

3              THE COURT:  And is there a loan against that truck?

4              THE DEFENDANT:  No.  It's all paid for.

5              THE COURT:  And how much did you pay for the truck?

6    Did you buy it new?

7              THE DEFENDANT:  No.  My brother died and my mom

8    loaned my brother some money or gave my brother some money

9    to get this truck, and then when he died there was no

10   insurance to pay it, so instead of letting the truck go

11   back, I took over the payments.  Then my son was killed, and

12   from the money from that, then I paid off -- paid the truck

13   off.  I paid my house off and everything else I owned.  I

14   paid for -- you know, he was killed in the military, and so

15   I used that money to pay off everything, and so --

16             THE COURT:  Do you have a bank account somewhere?

17             THE DEFENDANT:  Yes, I do.

18             THE COURT:  How much is in that bank account?

19             THE DEFENDANT:  I really don't know for sure.

20             THE COURT:  Your best estimate.

21             THE DEFENDANT:  Less than 10,000, I would think.  I

22   mean I don't know because I've been locked up for a year.

23             THE COURT:  Do you have a checking account?

24             THE DEFENDANT:  It's checking, yeah.

25             THE COURT:  You have a savings account somewhere?

1          THE DEFENDANT:  Yes, I do.  Same place.

2          THE COURT:  Two separate accounts?

3          THE DEFENDANT:  Yeah.

4          THE COURT:  About how much is in the savings

5    account?

6          THE DEFENDANT:  I really don't know.

7          THE COURT:  Best estimate.

8          THE DEFENDANT:  Wild guess, maybe a couple

9    thousand.  I don't know.

10          THE COURT:  Do you have any investment accounts

11    anywhere?

12          THE DEFENDANT:  No.

13          THE COURT:  Have a retirement account somewhere, an

14    IRA account, some sort of a 401(k), anything like that?

15          THE DEFENDANT:  No.  I'm retired, drawing Social

16    Security, and I know that's going to stop here soon, and

17    then the retirement from where I worked.

18          THE COURT:  And you worked where?

19          THE DEFENDANT:  I worked at Olin.

20          THE COURT:  And so that retirement account is

21    maintained where?

22          THE DEFENDANT:  Where?

23          THE COURT:  Uh-huh.

24          THE DEFENDANT:  At Olin Credit Union.

25          THE COURT:  So is that a retirement account that

```
 1   you --
 2              THE DEFENDANT:  Go ahead.
 3              THE COURT:  Is that a retirement account that you
 4   maintain yourself or is that a retirement account that Olin
 5   maintains control over?
 6              THE DEFENDANT:  I don't follow you.  I retired.
 7   They send me a check, it goes to my account, and that's
 8   that.
 9              THE COURT:  Okay.
10              THE DEFENDANT:  I don't know what you're saying.
11              THE COURT:  So Olin controls this retirement
12   account?
13              THE DEFENDANT:  Yeah, I guess.
14              THE COURT:  They just send you a check every month.
15   How much is that check?
16              THE DEFENDANT:  I think it's like 756 a month.
17              THE COURT:  And do you have anybody out there that
18   owes you money?
19              THE DEFENDANT:  Yes, I do.
20              THE COURT:  And how much is that?
21              THE DEFENDANT:  About 20,000.
22              THE COURT:  And who is that person?
23              THE DEFENDANT:  My brother.
24              THE COURT:  And what is your arrangement with him
25   with respect to when that money is to be paid back?
```

1        *THE DEFENDANT:*  Right now it's going through -- he

2  went through bankruptcy and the bankruptcy's got it all set

3  up to whenever -- I guess whenever they feel -- I don't know

4  how it's set up but it's set up to pay me back that money.

5        *THE COURT:*  So you were definitely on the list of

6  creditors?

7        *THE DEFENDANT:*  Yes.

8        *THE COURT:*  And he's going through a wage earner

9  reorganization of sorts, wage earner plan or something like

10  that?

11        *THE DEFENDANT:*  I really don't know what he's going

12  through.  Alls I know is bankruptcy.

13        *THE COURT:*  Have you received any payments through

14  the bankruptcy court?

15        *THE DEFENDANT:*  Well, before I got locked up, no.

16  After I got locked up, I don't know if any came or not, so

17  I'm not for -- I don't know.

18        *THE COURT:*  You didn't get any -- did you receive

19  any letters from the bankruptcy trustee or anyone saying you

20  will be receiving X number of dollars, anything of that

21  nature?

22        *THE DEFENDANT:*  It's just -- I don't remember if I

23  would receive so much or not.  I don't know.  I just know

24  that they set it up to pay me back and it's -- you know,

25  that's that.

1          THE COURT:  Was that note -- do you know what the

2     word "secured" means?  You know what that word means when a

3     loan is secured versus unsecured?

4          THE DEFENDANT:  I don't know which it is.  I don't

5     know which it is.

6          THE COURT:  All right.  Do you have any other

7     source of income?

8          THE DEFENDANT:  No.

9          THE COURT:  Any other assets we haven't talked

10    about?

11         THE DEFENDANT:  Well --

12         THE COURT:  Go ahead.

13         THE DEFENDANT:  He said my son's life insurance,

14    but you know, my son was killed on 4/30/06, and the

15    military -- he was in the Air Force, and they paid me

16    $250,000, along with my ex-wife, and I've used the money for

17    lawyer fees.  You know, I lost my job after -- in

18    8/2/06 because of all this, what I'm going through now, and

19    I've lived off that, trying to deal with this everything,

20    and that's -- the money's gone.

21         THE COURT:  So $250,000.  Did your wife take half

22    and you took half?

23         THE DEFENDANT:  She got 250,000; I got 250,000.

24         THE COURT:  I'm sorry, I misunderstood.

25         THE DEFENDANT:  And I used the money to pay off my

1    house, the truck, the motorcycle, you know, and then I get

2    hit with all these -- you know, with lawyer fees and

3    everything else, and then I had to live off that money

4    for -- well, 'til now, from '06 'til now, so you know --

5         THE COURT:  So your testimony under oath is that,

6    of the $250,000, other than the less than 10,000 that's in

7    your checking account and the approximate 2,000 that's in

8    your savings account, there's no more of that 250,000 that's

9    left in your name anywhere?

10        THE DEFENDANT:  No, no.

11        THE COURT:  When you received the $250,000 did you

12   deposit in some account somewhere?  What did you do with the

13   money?

14        THE DEFENDANT:  Well, I received the money -- like

15   I said, he was -- in '06 he was killed.  In July of '06 I

16   get hit with these charges, so then I had the government --

17   it was a checking account from the government checkbook and

18   they gave me first check for like a -- not a Social Security

19   check, but for $50,000.  You know, that's the first thing

20   they gave us.

21        THE COURT:  So they didn't give you 250 all at

22   once; they just gave you 50 at first?

23        THE WITNESS:  They gave me -- what they did was two

24   guys from the Air Force came to myself and my ex-wife's

25   house and, you know, they were trying to settle the affairs,

1    and they handed us each a check for $50,000.  It shocked me.

2    I had no idea this money was even coming.  You know, I'd

3    rather have my son back than the money.

4              THE COURT:  Of course.

5              THE DEFENDANT:  And so I waited for a long time to,

6    you know, even -- what I'm going to do with this money, you

7    know.  And so I put the money in the bank and then I started

8    paying off things, and then they sent me a checkbook for the

9    other 200,000.  Well, first thing I needed to do was pay the

10   state lawyer 10,000 to start what I'm going through, so

11   that -- you know, there went 10,000 right there.

12             THE COURT:  For the state case, the state criminal

13   case?

14             THE DEFENDANT:  Right, right.  And then I paid off

15   my house and paid off a few other things, you know.  But I

16   didn't spend the money, you know, foolishly or anything

17   else.  You know, my son died for that money and that's hard

18   for me, real hard.  I'd rather have my kid back than that

19   money.

20             THE COURT:  Completely understand that.  And so you

21   say they gave you a checkbook.  That means that the money

22   was in some account that they established somewhere?

23             THE DEFENDANT:  Yes.  It was in some government

24   checking account.  Have no idea where it was at, but you

25   know, I wrote checks on it, and then they finally came to

```
 1    like the end of it and they just send me the rest of the
 2    money because -- I paid off the house.  It was like 60,000.
 3    I paid the house off, and you know, then they sent me the
 4    rest of the money and I put it in the bank, you know, and --
 5              THE COURT:  So it got down below a certain amount
 6    and they just said, well, now that you're below a certain
 7    amount we're going to send you the actual --
 8              THE DEFENDANT:  Whatever's left, right.
 9              THE COURT:  The balance?
10              THE DEFENDANT:  Correct.
11              THE COURT:  You don't recall what that amount was?
12              THE DEFENDANT:  It was I think about 110,000,
13    something like that.  You know, I don't remember.  I know it
14    was close to about 100,000.  It was over -- about that much,
15    I guess.
16              THE COURT:  And so bottom line is, the money's
17    gone?
18              THE DEFENDANT:  Right, correct.
19              THE COURT:  Except that you have this house that is
20    paid off, but you turned -- you've given over ownership of
21    that to your daughter?
22              THE DEFENDANT:  Correct.  And I didn't do that
23    because trying to wiggle out of, you know, having the money
24    or whatever.  It's just, you know -- I mean I don't know.  I
25    just -- I didn't do it for that purpose, let's put it that
```

          1   way.  That's the furthest from my mind.

          2          THE COURT:  What was on your mind?

          3          THE DEFENDANT:  I mean I'm in jail, you know.  I

          4   can't -- I want my daughter to have that money, you know.

          5          THE COURT:  It's not money; it's a house.

          6          THE DEFENDANT:  Okay.  So sell the house then.

          7          THE COURT:  Do you have some understanding with her

          8   that if you're found not guilty and you're free to go at

          9   some point in time that she gives it back to you or that you

         10   just live in her house?

         11          THE DEFENDANT:  Basically I lost the house.  You

         12   know, I -- look, it comes down to this:  My son died for

         13   that money, you know, and that really hurts me, you know.

         14   I'd rather live in the street, you know, than -- I want my

         15   daughter to have the money.  I don't care, you know.

         16          THE COURT:  So if you're found not guilty, then

         17   you're free to go, you'll go get a different house?

         18          THE DEFENDANT:  Correct.

         19          THE COURT:  It's now her house and it's paid for

         20   with, as you say, money that your son had to die for, and

         21   you wouldn't want to live in it in any event; is that what

         22   you're saying?

         23          THE DEFENDANT:  Well, yeah.  This January of '09 --

         24   my mom is 84 years old, and she fell going out the door and

         25   broke her hip, and I was going to the hospital every day,

1    you know, and she was going to get out like on a -- I forget

2    what day, but I think it was a Friday.  Whatever day, I

3    can't remember.  But I got arrested or re-arrested, whatever

4    you want to put it, for this here.  And I was going to stay

5    with my mom and help my mom.  You know, she's 84 and she

6    broke her hip.  Now I'm dealing with this, you know, so

7    basically the house didn't mean, you know, much to me.  I

8    was going to stay with my mother and help her.

9         THE COURT:  Well --

10        MS. SCOTT:  Your Honor, may I be allowed to speak?

11        THE COURT:  Absolutely, Ms. Scott.

12        MS. SCOTT:  Thank you.

13        As you know, Your Honor, we did a presentence

14   report before the plea, and I would just notice that

15   probation determined, based on his assets, that he was -- he

16   had the ability to pay a fine.  They noted that he had a

17   rather significant amount of assets which he plans to give

18   to his daughter.  I think that's kind of interesting.

19        THE COURT:  I wasn't clear enough to bring that in.

20   Could I -- when you're done talking, I'd like to see that.

21   I forgot that we had had a presentence report in this case.

22        MS. SCOTT:  A couple things I wanted to note was,

23   he's still receiving -- even though he's detained, receiving

24   $757 in retirement benefits and $1,729 in Social Security

25   benefits for an income, monthly income of 2,486.  Now, he

1    told probation that his daughter is using approximately $500

2    of that for per month to pay his expenses, insurance, taxes,

3    utilities, things like that.  They indicated this would

4    still result in him having a net monthly cash flow of

5    approximately $1,836.

6           There's a couple of discrepancies.  He says that he

7    was living off this insurance settlement, $250,000, but then

8    later he says it's all gone, that he spent it, just like

9    he's been testifying here, that it's pretty much all gone

10   because he's paid off his house and things like that.  So I

11   don't know why -- I'm not sure what the balance is with

12   respect to that $250,000.

13          According to probation, he only had -- he has a

14   savings account of -- two of them, one for $212, and a

15   checking account for $28.  They also talk about him having a

16   Ford, 2004 F-150 pick-up truck, which is valued at $18,000.

17   Again, he plans to give that to his daughter, which I think

18   is very interesting.  Again, he talks about his house.  He

19   planned to give that to his daughter.  It's assessed at

20   $30,390, has a fair market value of $90,170.  He has a 2000

21   Suzuki motorcycle and another motorcycle, 2005 Harley

22   Davidson, which he purchased for 9,000.  Again, he plans on

23   giving this to his daughter.  Has three Honda motor

24   scooters.  He was buying a four-wheeler.

25          This defendant was not suffering from any debts by

1    any -- or suffering from poverty by any means.  It sure

2    looks like he has the ability to pay for an attorney.  He's

3    paying for a state attorney, he's paying for Mr. Stobbs.

4    Now, I will note that probation did note that he had an

5    outstanding balance on his loan for the motorcycle of

6    $7,000.  They said it's in good standing.  And he has a debt

7    for an automobile of $12,500, which consists of monthly

8    payments of $247, which apparently -- I would assume that

9    since his daughter's paying his expenses out of his money,

10   that would be covered.

11        So I guess my point is, Your Honor, two things that

12   bother me, and I think one of them the Court kind of

13   mentioned was, you know, most of his assets -- this is

14   pre-PSR.  Most of his assets he's conveniently, you know,

15   given to his daughter.  For what reason, we don't know.  I

16   mean he's given her his home, his pick-up truck, his motor

17   scooters.  Almost everything he's giving to her.  Do we know

18   that's because he's trying to get rid of his assets?  We

19   don't.  I just think that's interesting.

20        Another thing I wanted to point out was probation's

21   determination that he does have a rather significant amount

22   of assets, has a stable income and limited expenses.  So

23   they even determined that he had an ability to pay a fine

24   within the guideline fine range.  And as Your Honor knows,

25   that's not ordinary.  Typically they can't pay a fine within

 1  the guideline range.

 2          So Your Honor, I just wanted to point those couple

 3  things out to you.  Do you still need my --

 4          THE COURT:  No.  Susan brought it in.

 5          THE DEFENDANT:  May I speak now?

 6          THE COURT:  Absolutely, Mr. Bechel.  Feel free to.

 7          THE DEFENDANT:  Okay.  Before I was arrested in

 8  January, I had about $18,000 in the bank.  Okay.  I get

 9  arrested and come here, and then John says that he wants X

10  amount of dollars.  Well, I spent all that money, plus I had

11  to borrow another 10,000 from my ex-wife to pay him.  I paid

12  him $30,000.  And the car, that -- my brother wanted me to

13  buy a car in my name but he's making the payments.  I have

14  nothing to -- well, I own the car but he's making the

15  payments.  That car belongs to him.  He's the one that went

16  through bankruptcy, owes me the money, and he couldn't have

17  a car for his family, so he asked me if I would sign for him

18  and he'd make the payments and I said, okay, I would do it.

19  And that's what -- that's how that car came about.

20          MS. SCOTT:  Your Honor, if I could just point out,

21  some of the things that he's saying is not -- he didn't

22  report to probation.  He didn't say, *Hey, I loaned my -- you*

23  *know, that automobile is really my brother's and he's paying*

24  *for it*, and, *Hey, I had to borrow $10,000 from my ex-wife to*

25  *pay for my lawyer.*

1            *THE DEFENDANT:*  They didn't ask that either.

2            *MS. SCOTT:*  You know, most of what he says is a

3    positive that -- a positive asset, except for, like I said,

4    probation already does have two outstanding debts, but both

5    are in good standing.

6            *MR. STOBBS:*  Judge, this is a situation I think

7    where we're fortunate to have a presentence investigation

8    report in front of us.  I think that -- I'm hopeful that you

9    can make a determination on whether or not he has the assets

10   to hire an attorney based on the presentence investigation

11   report, which I'm fearful that if Mr. Bechel under oath says

12   something that's not exactly 100 percent correct, that it's

13   going to -- it could harm him down the road, I guess.

14           *THE DEFENDANT:*  In April of last year, of '08, I

15   had a stroke and I'm still suffering from that.

16           *THE COURT:*  What symptoms do you have that you

17   attribute to that stroke?

18           *THE DEFENDANT:*  What symptoms now?

19           *THE COURT:*  Uh-huh.  You say you're still suffering

20   from it.  In what way are you suffering from that stroke?

21           *THE DEFENDANT:*  The confusion, the dizziness,

22   the -- I don't know, just all the symptoms really.  High

23   blood pressure, you know, high cholesterol, you know, all

24   that stuff.  When I first had the stroke I couldn't -- my

25   speech was slurred, I couldn't use my right arm, motor

 1    skills were totally gone, you know.  I'm just recouping from

 2    that.

 3         THE COURT:  When is it that you feel confused?  You

 4    don't seem confused today.

 5         THE DEFENDANT:  I have to stop and I have to think

 6    about stuff, you know, like say what goes on here, and I'll

 7    have to analyze and think about it and, you know, but -- I

 8    don't know, just -- just easy to confuse me, you know.  I'm

 9    telling you the truth here and, you know --

10         THE COURT:  Is there something we've talked about

11    today that's confused you?

12         THE DEFENDANT:  I mean what do you think I'm trying

13    to hide assets or give away assets because I want another

14    attorney?  You know, I mean I don't know what you want from

15    me, you know.

16         THE COURT:  Well, I talked about what I wanted, and

17    as I said, I'm trying to figure out whether or not you can

18    afford to hire an attorney.  And when I was talking about

19    the house, I told you my determination -- my question was

20    whether or not you had a motive to hide assets to make it

21    appear as though you could not afford an attorney.  But my

22    question was of you, Mr. Bechel, my question was:  Is there

23    anything we've talked about that you haven't -- that you've

24    been confused about?  Anything specific that you can

25    specifically say, *Well, this is confusing me*?

1        *THE DEFENDANT:*  Well, just why are you going

2   after -- you know, I mean I've been truthful with you about

3   the assets.  You know, why are you -- I mean I'm not trying

4   the hide anything.  I'm just -- I paid him $30,000 to start

5   off with, and I had to borrow ten of that, and that broke

6   me.

7        *THE COURT:*  So that's the question about my motive.

8   My question of you is:  Is there something you're confused

9   about?

10        *THE DEFENDANT:*  No, not really.  Just go on with

11   it.

12        *THE COURT:*  I mean I have to go through this

13   analysis with everybody.  I'm not picking on you.  I have to

14   go -- I have to make this determination with every single

15   person that wants to have the taxpayers pay for their

16   lawyer.  I'm not picking on you.  I mean this is something

17   we have to analyze with everybody.  I mean you don't get a

18   free lawyer just for the asking.  I mean you have to prove

19   that you're entitled to a lawyer paid for by the taxpayers.

20   You don't just say, *Judge, can I get a free lawyer*, without

21   proving to me that you're entitled to that.  You understand

22   that?  It's not just done just willy-nilly simply for the

23   assets.

24        *THE DEFENDANT:*  Okay.  I paid my first lawyer

25   10,000.  I paid 15 for a bond, you know, out of my money.  I

1   paid him 35, or 30, and I had to borrow ten for that.

2   There's $65,000 right there, you know.

3        THE COURT:  Don't you understand that the fact that

4   you've paid out $65,000 for a lawyer instead of showing that

5   you cannot afford a lawyer on its face demonstrates to the

6   world that, looks like Larry Bechel can pay for lawyers?  Do

7   you see that?  So I have to have you demonstrate to me that

8   you cannot afford a lawyer because you've shelled out a

9   bunch of money for lawyers.

10        THE DEFENDANT:  Okay.  Now I don't have any more

11  money.

12        THE COURT:  I see that's where you're coming from

13  but on paper it looks like I have in front of me a defendant

14  that can afford to pay lawyers, so I have to see whether or

15  not the contrary is, in fact, true.  Do you see what

16  analysis I have to go through?

17        THE DEFENDANT:  Okay.

18        THE COURT:  See, I put on a robe for a reason.  I

19  walk out here and I have to make findings and I have to

20  demonstrate whether or not you can -- I have to make a

21  determination whether or not you can afford a lawyer.  You

22  said something a minute ago, Mr. Bechel, that I thought was

23  a little curious, and that was you expected this 700 some

24  dollar a month pension to be -- apparently $757 a month,

25  according to the presentence report, you expected that to be

1    eliminated.

2         THE DEFENDANT:  No, no, no.  The Social Security,

3    the 1729.

4         THE COURT:  Okay.

5         THE DEFENDANT:  Not the retirement; the Social

6    Security.

7         THE COURT:  You expect the Social Security to be

8    terminated while you're pending trial?

9         THE DEFENDANT:  No, no, no.  If I'm found guilty or

10   plead guilty or whatever, then it will stop, won't it?  My

11   understanding, it does.

12        THE COURT:  But surely you don't expect it to

13   terminate while the case is pending?

14        THE DEFENDANT:  No, I don't think so.  At least I

15   hope not.

16        MS. SCOTT:  Your Honor, can I be a pest and point

17   out one more thing?

18        THE COURT:  Of course.

19        MS. SCOTT:  I just wanted to -- it just caught my

20   eye, something the defendant had said.  When you were asking

21   him about the home he indicated that his mother had just got

22   out of the hospital because of a broken hip or something and

23   that he had intended to stay with her and that's why he

24   didn't really care about the house or whatever.  But I would

25   note that in the PSR he indicated -- it indicates he was

 1   residing alone in his home.  There's nothing in here that

 2   says he was staying with his mom or planned to stay with his

 3   mom.  In fact, he did not even offer a release plan as to

 4   what he would do after he was gone.

 5        And with respect to his stroke, I would point out

 6   that, paragraph 67, probation noted that he did suffer a

 7   stroke which initially resulted in poor motor skills and

 8   memory loss.  It also reported that both his motor skills

 9   and memory have since improved.  So I would point that out

10   to the Court also.

11        THE COURT:  Well, in going through the presentence

12   report -- first of all, I'm not sure which is accurate.

13   Unless the bank accounts that Mr. Bechel spoke about here

14   have built up in value, the -- speaking with the probation

15   office, he reported very low balances.  Here he said he

16   couldn't remember.  When asked to -- I asked him to give a

17   best estimate.  He estimated -- well, he simply said under

18   $10,000.

19        When he filled out his personal financial statement

20   for probation, the -- I'm sorry.  It says here:  Information

21   received from the credit union shows balances of $212 in the

22   savings account, and -- two savings accounts, and then $28

23   in the checking account.  So that's considerably different

24   than a best estimate of something under $10,000, a couple

25   thousand dollars, so that those accounts are very, very lean

1    and offer no help.

2              THE DEFENDANT:   Whenever I came here I had to pay

3    him 30,000.  That took out 18.  I had about $18,000 left in

4    the bank, had took that money out, and I had to borrow ten

5    from my ex-wife, and she loaned me the money.  From being

6    locked up, the Social Security and the retirement have gone

7    to that account, and that's where the little bit of extra

8    money's come from.

9              THE COURT:   And the money that you got from your

10   ex-wife is definitely a loan and you have to pay it back?

11             THE DEFENDANT:   I have to pay that back.

12             THE COURT:   All right.  And that's $10,000?

13             THE DEFENDANT:   Right, correct.

14             THE COURT:   All right.  I'm troubled by the

15   conveyance of the house though.  I have insufficient

16   evidence here to conclude that it's a fraudulent conveyance,

17   so I can't make that finding, and it's not at the present

18   time an asset of the defendant's.  It looks like, in looking

19   at the presentence report, as far as the vehicles are

20   concerned, they're inadequate as far as assets given the

21   encumbrances on them.  I also think his current income,

22   given his situation and what it would cost for counsel,

23   would be inadequate, so Court finds the defendant is unable

24   to afford counsel and Court will appoint counsel for the

25   defendant.

1          So what happens, Mr. Bechel, is we have -- there's

2     a person on staff at the public defender's office that keeps

3     track of the next person who is in line to accept

4     appointment in a case, and we will contact her and have her

5     let us know who that is, and that's the person who will be

6     assigned to your case.  And so your motion for a new counsel

7     will be -- and for the withdrawal of Mr. Stobbs will be

8     granted.  Your motion for new counsel will be granted as

9     well.

10         *THE DEFENDANT:*  Let me ask you this:  Does he have

11    to give me any money back or is it just gone?

12         *THE COURT:*  That's between you and him as to your

13    agreement with him.  I'm sure there's some ethical rules on

14    that as well, but that's not something that involves me, so

15    that's between you and Mr. Stobbs.

16         *THE DEFENDANT:*  Your Honor, I've been dealing with

17    this since 7/28/06.  I'm ready to get this over with, you

18    know.  This is -- my life's been on hold, you know.  I've

19    been dealing with this, been going to court, doing

20    everything I've been asked, and I'm still dealing with this,

21    and it looks like it's going to be a long time more.  I'm

22    ready to get it over with, you know.  I mean just -- it's

23    went on and on and on.  Just tired of it, you know.

24         *THE COURT:*  Well, a good deal of why it's going and

25    on and on and on has to do with you, Mr. Bechel, so, you

1    know, you're -- I don't know why you're telling me this.  I

2    mean my recollection is we had an opportunity to get it over

3    with a few weeks ago when you decided you didn't want to get

4    it over with, so don't talk to me about you want to get it

5    over with.

6          *THE DEFENDANT:*  I got a letter from John saying

7    that we pleaded guilty.  He never came to me once, asked me

8    anything, if I wanted to, any -- consult me or anything.

9          *THE COURT:*  There's no question that you are the

10   only person who can decide whether or not you're going to

11   plead guilty.  That is you and you alone.  There's no lawyer

12   that can tell you you have to plead guilty.  There's no

13   judge that can tell you you have to plead guilty.  If we

14   would have gotten into the guilty plea hearing you would

15   have heard me say to you that you are completely in control

16   over whether or not you plead guilty.  You and you alone can

17   decide that.  I cannot, by law, take a plea from somebody

18   who does not want to plead guilty.  You're the only person

19   that can make that decision.

20          So you know, the problem you have in this case,

21   however, in terms of us speeding our way to trial is because

22   a good deal of this has to do with Canadian issues, and

23   logistically that takes some time.  And so now we've had to

24   reset the clock because we believed that you were going to

25   plead guilty, and so the Canadian issues were taken off the

1    table, and so now we have to establish time to get the

2    Canadian subpoenas and all that stuff set so that we can get

3    witnesses here from Canada, and now that's going to take

4    some time.

5        So I'm sure, as much as you'd like to have the

6    trial set next week, we can't do it because we believed that

7    we were going to have a plea in this case.  Now, I've known

8    Mr. Stobbs a very long time and he's a very good lawyer, and

9    I cannot for one moment believe that he led us to believe we

10   were going to have a plea in this case without you giving

11   him an indication that you were going to plead guilty.

12        *THE DEFENDANT:*  He didn't.  Okay.

13        *THE COURT:*  Now you're telling me that you talked

14   to the probation officer and --

15        *THE DEFENDANT:*  Wait a minute.  Wait a minute.  He

16   came there.  He sent a paper in the mail to me while I was

17   in jail saying said we plead guilty.  I don't know what it

18   means.  So I'm waiting and waiting and waiting, and finally

19   my daughter comes and talks -- he has a meeting with my

20   daughter and talks to her about it and tells her all about

21   it before it's even come to me, and then she comes there and

22   talks to me about it, and -- *Have you talked to your lawyer?*

23   *No, no, no, I haven't.*

24        Finally John shows up and then he talks to me, and

25   I said, *Well, let me have a couple days to think about it.*

1   Well, a couple days turned into a few minutes because the

2   probation officer showed up at the same time or whatever --

3   the presentence report or whatever that person was, while

4   he's still here telling me about we pleaded guilty, you

5   know.  No, he didn't.

6          MR. STOBBS:  Just a good thing, this is why you

7   keep memos.  This is mind boggling.  You know, it's --

8   nothing could be further from the truth.

9          THE DEFENDANT:  I give up.

10         THE COURT:  Well, there's no use in talking more

11   and more about this.

12         Mr. Bechel, you had an extraordinarily good offer

13   on the table, one that gave you a 5K1 motion, which hardly

14   ever happens in this district.  So there's -- without me

15   even looking at these memos, there's all kinds of

16   circumstantial evidence here.  So I, quite frankly, don't

17   know what you're talking about or what the purpose of your

18   saying to me you're tired of this, of all this going on.  I

19   mean what do you want me to do?

20         THE DEFENDANT:  I mean this just went on for so

21   long.  I've been dealing with this since '06, you know.

22   This is '09, almost '10, you know.

23         THE COURT:  This is -- from a federal standpoint

24   this is an '09 case, sir.

25         THE DEFENDANT:  I was charged by the state with the

1    same charges.

2              THE COURT:  That's got nothing to do with me.

3              THE DEFENDANT:  Okay.  This is boggling to me then,

4    you know.

5              THE COURT:  We're done.

6        *(Court adjourned)*

7                              *   *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **REPORTER'S CERTIFICATE**

2

3          I, Laura A. Esposito, RPR, CRR, CCR(MO), Official Court
   Reporter for the U.S. District Court, Southern District of

4  Illinois, do hereby certify that I reported in shorthand the
   proceedings contained in the foregoing 31 pages, and that
   the same is a full, true, correct, and complete transcript

5  from the record of proceedings in the above-entitled matter.

6          Dated this 14th day of August, 2014.

7

8                              _____

9                              LAURA A. ESPOSITO, RPR, CRR, CCR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25